Page 1

1                UNITED STATES DISTRICT COURT

2                EASTERN DISTRICT OF NEW YORK

3    _____

4    ARTICLE 13, LLC,

5               Plaintiff,

6         v.                          Civil Action No.

7    LASALLE NATIONAL BANK            1:20-cv-03553-

8    ASSOCIATION, CENTRAL MORTGAGE    RRM-RML

9    COMPANY, ALLIANCE MORTGAGE

10   BANKING CORP., and PONCE DE LEON

11   FEDERAL BANK,

12              Defendants.

13   _____

14            VIDEOCONFERENCE DEPOSITION OF

15                 HOWARD HANDVILLE

16   DATE:        Tuesday, July 27, 2021

17   TIME:        11:19 a.m.

18   LOCATION:    Remote Proceeding

19                New York, NY 10001

20   REPORTED BY: Silas Shelley, Notary Public

21                Kari Rusinko, Notary Public

22

23

24

25

Page 2

1    A P P E A R A N C E S

2    ON BEHALF OF PLAINTIFF ARTICLE 13 LLC:

3         EDUARD KUSHMAKOV, ESQUIRE (by videoconference)

4         Jacobs, PC

5         80-02 Kew Gardens Road, Suite 300

6         Kew Gardens, NY 11415

7         eduard@jacobspc.com

8

9    ON BEHALF OF DEFENDANTS US BANK NATIONAL

10   ASSOCIATION, AS TRUSTEE, SUCCESSOR IN INTEREST TO

11   BANK OF AMERICA, NATIONAL ASSOCIATION, AS TRUSTEE,

12   SUCCESSOR BY MERGER TO LASALLE BANK NATIONAL

13   ASSOCIATION, AS TRUSTEE FOR MORGAN STANLEY MORTGAGE

14   LOAN TRUST 2007-2AX, MORTGAGE PASS THROUGH

15   CERTIFICATES, SERIES 2007-2AX:

16        DAVID YOHAY, ESQUIRE (by videoconference)

17        Houser LLP

18        60 E 42nd Street, Suite 2330

19        New York, NY 10165

20        dyohay@houser-law.com

21

22

23

24

25

Page 3

1                          I N D E X

2    EXAMINATION:                                    PAGE

3        By Mr. Kushmakov                            6

4

5

6                        E X H I B I T S

7    NO.              DESCRIPTION                     PAGE

8    Exhibit 1   Abbott 2007 Foreclosure             36

9    Exhibit 2   Defendant's Responses to

10               Plaintiff's First Request

11               for Production of Documents          45

12   Exhibit 3   Defendant's Rule 26(a)(1)

13               Initial Disclosures                  6

14

15

16                 (*Exhibits attached.)

17

18

19

20

21

22

23

24

25

Page 4

1              H. HANDVILLE

2              REPORTER:  Good morning.  My name is

3   Silas Shelley; I am the officer assigned by Veritext

4   to take the Zoom record of this proceeding.  I am a

5   notary authorized to take acknowledgements and

6   administer oaths in New York.  We are now on the

7   record.

8              This is the deposition of Howard

9   Handville taken in the matter of Article 13, LLC vs.

10  Central Mortgage Company [sic] at 11:19 a.m. on

11  Tuesday, July 27, 2021, remote via Zoom.

12              Due to the pandemic and out of concern

13  for public and participant safety, parties agree that

14  I will swear in the witness remotely outside of his or

15  her presence.

16              Additionally, absent an objection on

17  the record before the witness is sworn, all parties

18  and witness understand and agree that any certified

19  transcript produced from the recording virtually of

20  this proceeding:

21                  - is intended for all uses permitted

22                  under applicable procedural and

23                  evidentiary rules and laws in the same

24                  manner as a deposition recorded by

25                  stenographic means; and

```
                                              Page 5
 1                        H. HANDVILLE
 2                  - shall constitute written stipulation
 3                  of such.
 4                  At this time will everyone appearing
 5       remotely please identify yourself for the record.
 6                        MR. HANDVILLE:  My name is Howard
 7       Handville.
 8                        MR. KUSHMAKOV:  Eduard Kushmakov, on
 9       behalf of plaintiff Article 13 LLC.
10                        MR. YOHAY:  David Yohay from Houser LLP
11       on behalf of the defendant, US Bank National
12       Association, as trustee, successor in interest to Bank
13       of America, National Association, as trustee,
14       successor by merger to LaSalle Bank National
15       Association, as trustee for Morgan Stanley Mortgage
16       Loan Trust 2007-2AX, Mortgage Pass Through
17       Certificates, Series 2007-2AX.  Good morning.
18                        REPORTER:  Thank you.  Hearing no
19       objection, I will now swear in the witness.  Please
20       raise your right hand.
21       WHEREUPON,
22                        HOWARD HANDVILLE,
23       called as a witness, and having been first duly sworn
24       to tell the truth, the whole truth and nothing but the
25       truth, was examined and testified as follows:
```

```
                                              Page 6

 1                          H. HANDVILLE

 2                    REPORTER:  We may proceed.

 3                          EXAMINATION

 4       BY MR. KUSHMAKOV:

 5           Q    Good morning, Mr. Handville.  My name is

 6       Eduard Kushmakov.  I am an attorney at Jacobs, PC.

 7       I'm here representing Article 13 LLC, the plaintiff in

 8       this action.

 9                I'm going to be asking you a series of

10       questions today to which you'll have to respond

11       truthfully, as I'm sure your attorney has informed

12       you.  As you can see there's a court reporter present.

13       The court reporter is going to be taking down

14       everything we're saying.  So it's very important that

15       you keep your answers verbal.  And you do not shake

16       your head to say no or nod your head to say yes or

17       make any noises that the court reporter cannot take

18       down.

19                If you need a break at any time, please feel

20       free to let me know.  You may take a break so long as

21       no question is pending.  And if, for whatever reason,

22       you don't understand any question that I'm asking you,

23       please tell me and I'll do my best to rephrase it.

24       Otherwise, I'm going to assume that you understand my

25       question.
```

```
                                                Page 7
 1                         H. HANDVILLE
 2            Do you understand these instructions?
 3       A    I do.
 4       Q    Are you presently on any medication?
 5       A    No.
 6       Q    Is there any medication that you should have
 7   taken and failed to do so?
 8       A    No.
 9       Q    Have you had any drugs or alcohol in the
10   last 24 hours?
11       A    No.
12       Q    Can your ability to testify be affected in
13   any way?
14       A    No.
15       Q    Please state your address.
16                 MR. YOHAY:  Use your business address,
17   please.
18       A    1661 Worthington Road, Suite 100, West Palm
19   Beach, Florida, 33409.
20       Q    This is your business address; correct?
21       A    Yes.
22       Q    And I'm assuming you're presently employed.
23       A    Yes.
24       Q    By whom are you employed?
25       A    Ocwen Financial Corporation.
```

```
                                              Page 8
 1                        H. HANDVILLE
 2        Q     And how long have you been employed by Ocwen
 3   Financial?
 4        A     I first started with Ocwen in August of
 5   2010, and I have been with them ever since.
 6        Q     And when you started with Ocwen, what was
 7   your title?
 8        A     Loan analyst.
 9        Q     And what is your title currently?
10        A     Senior loan analyst.
11        Q     Are the duties more or less the same?
12        A     The pay is a little better, but the job's
13   the same.
14        Q     So can you describe what this job entails?
15              MR. YOHAY:   Objection.   Just, Ed, which
16   job are you referring to?   Loan analyst or senior loan
17   analyst?
18   BY MR. KUSHMAKOV:
19        Q     Well, maybe so.   Are the duties of a loan
20   analyst and senior loan analyst the same?
21        A     Largely, yes.
22        Q     So can you start by describing your duties
23   as a loan analyst?
24        A     As a loan analyst and a senior loan analyst,
25   I'm tasked with doing research for the law department
```

Page 9

1                        H. HANDVILLE
2    on litigated matters.  I am charged with execution of
3    documents such as pleadings, interrogatory responses,
4    things like that.  Also tasked with appearing as
5    necessary for court required appearances such as
6    mediations, order to show cause hearings, foreclosure
7    actions, trials, depositions, etcetera.  And I'm also
8    a certified MERS officer and can execute on behalf of
9    MERS for the corporation.
10       Q    You mentioned research.  What sort of
11   research?
12       A    Sometimes our counsels have questions
13   regarding transactions or payment history questions or
14   just general servicing related questions that we try
15   to research and provide responses.
16       Q    And by research, do you mean you research
17   internal documents or external databases or something
18   else?
19       A    We research business records that we
20   possess.
21       Q    Ocwen's business records?
22       A    Well, now it's PHH business records, but
23   before that it was Ocwen's.
24       Q    And who is PHH or what is PHH?
25       A    PHH is a company that Ocwen merged with back

```
                                              Page 10
 1                        H. HANDVILLE
 2      in 2019.  And PHH is the successor servicer to Ocwen
 3      Loan Servicing.
 4          Q    Let's talk about your education for a
 5      moment.  What is your highest level of education?
 6          A    I got a GED in high school.  Took a couple
 7      of college courses but didn't do anything with it
 8      'cause I working nights and it was just too difficult.
 9      So that's basically it.
10          Q    Prior to August 2010, who were you employed
11      by?
12          A    Prior to August of 2010, I was with a
13      company ABN AMRO Mortgage.
14          Q    And how long were you employed by ABN?
15          A    Correct.  Three -- go ahead, I'm sorry.
16          Q    How long were you employed by ABN?
17          A    I was three years with them.
18          Q    So from 2007 to 2010?
19          A    Oh, God.  I don't remember the dates.  I
20      think it was a little earlier than that.  There was an
21      unemployment gap in the interim.
22          Q    Okay.  Well what was your position at ABN?
23          A    I was the audit manager for quality control.
24          Q    Quality control for what specifically?
25          A    Pre- and post-closings.  It was an
```

Page 11

1                         H. HANDVILLE

2    origination company so they would generate a lot of

3    business.  And I would audit the underwriters and the

4    pre- and post-closing documents, the disclosure

5    documents, things like that.

6         Q    And prior to ABN, where did you work?

7         A    Prior to them I worked for a year as an

8    outside sales consultant for a manufacturer of

9    industrial construction products.

10        Q    You mentioned an unemployment gap.  Is that

11   unemployment gap in between your time at ABN to your

12   time now at Ocwen or PHH?

13        A    Let.s see.  The gap I believe was between

14   ABN and my prior employer, which was a company called

15   CMAC [ph], a private mortgage insurance company.  I

16   was with them for ten years.  There was about a four-

17   year gap between those two jobs.

18        Q    And why was there a gap?

19             MR. YOHAY:  Objection.  You can answer.

20        A    Well, I tried to stay in the mortgage

21   business and things were pretty tough back then.  It

22   was hard to find a job.

23        Q    You have any certifications or licenses?

24             MR. YOHAY:  Objection.  Ed, do you mean

25   pertaining to this type of work or --

```
                                            Page 12

 1                       H. HANDVILLE

 2              MR. KUSHMAKOV:  Yeah.

 3              MR. YOHAY:  -- anything at all?

 4              MR. KUSHMAKOV:  Anything at all.

 5              MR. YOHAY:  You mean like a driver's

 6   license or a boating license or anything like that?

 7                   MR. KUSHMAKOV:  Do you have --

 8                   MR. YOHAY:  Just narrow the question,

 9   thanks.

10   BY MR. KUSHMAKOV:

11       Q    Do you have any certifications or licenses

12   as they currently pertain to your line of work?

13       A    Just the MERS certification.

14       Q    Have you ever been a mortgage broker?  I

15   apologize.  Let me rephrase.  Have you ever been

16   licensed as a mortgage broker?

17       A    No.

18       Q    Did you receive any training for your

19   current position as a senior loan analyst?

20       A    There's on the job training and there's

21   online training that we receive.

22       Q    Did you receive any training for your prior

23   position as a loan analyst?

24       A    That's what I was referencing, so yes.

25       Q    So between being a loan analyst and being a
```

```
                                              Page 13
  1                        H. HANDVILLE
  2    senior loan analyst, there's no additional training.
  3    Is that correct?
  4         A    Well, as a loan analyst when you are
  5    assigned a foreclosure, a lot of -- a lot -- the bulk
  6    of the foreclosure action from our servicers are
  7    generally uncontested.  And those are pretty easy to
  8    go to in some cases.  Like, New York, in Brooklyn, for
  9    example, they may have an Ocwen day.  And they'll send
 10    several witnesses up there and they'll just do a whole
 11    bunch of defaulted borrowers, foreclosures, just to
 12    prove up their business record and their judgment
 13    figures.
 14         So that's primarily what the loan analysts
 15    handle.  The senior loan analysts more or less
 16    specialize on the ones that are litigated.  Where
 17    there are issues involving many number of things.  You
 18    know, they tend to be a little bit more involved and
 19    tend to involve more things like depositions and
 20    discovery responses and things like that.  So that's a
 21    little bit more towards the senior loan analyst's
 22    responsibilities than handling the bulk foreclosure
 23    volumes that the loan analysts handle.
 24         Q    So as a senior loan analyst, do you have any
 25    decision-making authority when it comes to litigated
```

```
                                              Page 14
 1                         H. HANDVILLE
 2     foreclosure actions?
 3                    MR. YOHAY:  Objection.  You can answer.
 4          A    No.
 5          Q    As a senior -- actually, let -- withdrawn.
 6     When were you promoted to senior loan analyst?
 7          A    I don't recall for sure.  I believe it was
 8     late 2012.
 9          Q    Are senior loan analysts involved in any
10     business decisions that Ocwen makes?
11                    MR. YOHAY:  Objection.  You can answer.
12          A    Not generally.
13          Q    Would they ever be involved?
14                    MR. YOHAY:  Objection.  You can answer.
15          A    Sometimes loan analysts are involved in
16     doing the research that may result in a decision that
17     needs to be made.  But, generally speaking, the
18     decisions are made either by the business unit or
19     inhouse counsel.
20          Q    And in your position, do you frequently
21     interact with the business unit?
22          A    Fairly regularly, yes.
23          Q    And what does the business unit do?
24                    MR. YOHAY:  Objection.  You can answer.
25          A    It depends on which business unit you're
```

1                    H. HANDVILLE

2    talking about.  You have foreclosure, you have loss

3    mitigation.  There's a lot of different divisions in

4    -- in a servicing aspect.

5        Q    Do you interact with the different

6    divisions, more or less -- withdrawn.  Do you interact

7    with all those different divisions?

8        A    A number of them, yes.

9        Q    Which ones do you interact with most often?

10       A    Loss mitigation, probably, is the number

11   one.  Sometimes foreclosure.  Sometimes our

12   ombudsman's office.  Just depends on the nature of the

13   issue.

14       Sometimes collections, sometimes payment

15   processing, sometimes escrow.  Just depends on what

16   questions are posed; what issues need to be

17   researched; who's asking and why, etcetera.

18       Q    What is the loss mitigation division of the

19   business unit do?

20       A    They try to assist borrowers in seeking some

21   sort of resolution regarding a loan that's in default.

22   Whether it's a forbearance plan or repayment plan to

23   help them get caught up, depending on the financial

24   ability of the borrower and the severity of the

25   default.  They process modification requests.

```
                                              Page 16
 1                        H. HANDVILLE
 2    Sometimes they handle short sales or discount payoffs.
 3    Loss mitigation can also include deed in lieu of
 4    foreclosure.
 5         Q    Is loss mitigation involved -- withdrawn.
 6    Loss mitigation speaks with the borrowers directly; is
 7    that correct?
 8         A    Borrowers directly as well as their
 9    authorized representatives, such as counsel or if they
10    designate a third party to speak on their behalf and
11    send in the proper authority.
12         Q    Is loss mitigation involved when a loan
13    is -- withdrawn.  If a foreclosure action is started,
14    is loss mitigation involved during the pendency of the
15    foreclosure action?
16         A    Yes.
17         Q    How?
18         A    They continue to reach out to the borrower.
19    Try to see if they can make contact -- make the right
20    party contact; determine the reason for default; get
21    some idea of what the borrower's intentions are with
22    regards to the property, what they may or may not be
23    interested in.  And depending on what those responses
24    come back as depends on how they approach it.
25         Q    What is loss mitigation's involvement prior
```

```
                                              Page 17

 1                          H. HANDVILLE

 2    to the beginning of a foreclosure action?

 3        A     They reach out to borrowers that are in

 4    default.  They send them written correspondence as

 5    well as phone calls.

 6        Q     Who makes the decision to bring the

 7    foreclosure action?

 8                    MR. YOHAY:  Objection.  You can answer.

 9        A     The servicer handles the foreclosure action

10    on behalf of the trust.

11        Q     Can loan analysts recommend that a

12    foreclosure begin?

13        A     No.

14        Q     Who can make a recommendation to begin a

15    foreclosure action?

16        A     Collection department.

17        Q     Is the collection department part of the

18    loss mitigation division?

19        A     No.

20        Q     What does the foreclosure division do?

21        A     They process foreclosures that -- on loans

22    that are in default.  They do a -- I think they call

23    it a SCRA search with the Department of -- Department

24    of Defense.  To see if the borrower is a serviceman --

25    active serviceman.
```

1                    H. HANDVILLE

2         They prepare a package to be presented to

3    foreclosure counsel to initiate foreclosure.  They

4    instruct them as to what name the -- they call it the

5    FITNO -- foreclose in the name of -- information.  And

6    they send a package off to the foreclosure counsel to

7    start that process.  And then from there it.s a matter

8    of the counsel looking at the documentation, checking

9    title, and deciding if they need additional documents,

10   such as an assignment of mortgage or payoff figures or

11   any other thing they need to get the package complete

12   enough to, you know, file with the courts.

13        Q    So describe to me a typical interaction you

14   have with the loss mitigation unit.

15             MR. YOHAY:  Objection.  You can answer.

16        A    My typical interaction?

17        Q    Yes.

18        A    Well usually I'm asking them questions.

19   Questions --

20        Q    What sorts of --

21        A    Questions about a repayment plan or a

22   modification.  Questions about the terms in the

23   modification.  I-- I have recently had communications

24   with them about the stand-alone application that they

25   use to process the loss mitigation modifications

H. HANDVILLE

1

2  efforts in.  A lot of times it's just general

3  questions or verifying information that I think I know

4  that I need a little bit of outsourcing to verify what

5  I think I have come across.

6      Q    What do you mean by outsourcing?

7      A    Third-party verification.  If I go back --

8  if -- if I'm looking at something and I think I have

9  an answer, but I'm not sure, I'll reach out to the

10  appropriate department to verify what I'm looking --

11  looking at is what I see -- is what I think it is.

12      Q    So by outsourcing you mean just a different

13  department within Ocwen.

14      A    Right.  It's probably not the best term, but

15  I -- I'm looking for third party verification of my

16  ideas or concepts or interpretations of something that

17  I see.

18      Q    Can you describe to me some of your typical

19  interactions with the foreclosure division.

20      A    Don't have really that much with

21  foreclosures.  I may call them and ask them if they

22  received an email from somebody or if they have an

23  email that they sent to somebody.  Usually it's just

24  trying to research background information on the

25  foreclosure.

```
                                            Page 20
1                      H. HANDVILLE
2       Q     What sort of background information?
3       A     It's hard to say.  Did they reach out to XYZ
4   insurance company to find something out?  Did they get
5   a response?  Things like that.
6       Q     In the course of your duties would you
7   prepare some sort of report?
8       A     I'm sorry.  You're breaking up.  What was
9   that again?
10      Q     In the course of your duties would you
11  prepare some sort of report?
12                 MR. YOHAY:  Objection.  You can answer.
13      A     I have compiled spreadsheets.  I don't know
14  if I would call that a report.
15      Q     And what sort of information is contained in
16  the spreadsheets?
17      A     Just -- it could be timeline information.
18  It could be payment application information.  Just
19  general information regarding research I'm doing
20  for -- on a given loan.
21      Q     What would the timeline information be?
22      A     Well it would be a timeline basically when
23  was the loan boarded; who was the prior servicer; what
24  did Ocwen do, you know, once we got the loan?  Did we
25  initiate foreclosure; was it already in foreclosure?
```

Page 21

1                        H. HANDVILLE
2    Did we reach out to the borrowers; when, how, what was
3    the outcome?  Was a modification, you know, offered or
4    considered or discussed?  You know, things like that.
5         Q    The timeline information include when the
6    note was purchased by Ocwen?
7                   MR. YOHAY:  Objection.  You can answer.
8         A    It might.
9         Q    Does Ocwen purchase notes?
10        A    Ocwen has purchased notes.  I don't know
11   that it's a regular activity, but that has occurred.
12   Largely, they service loans for others.
13        Q    When you say, "service loans for others,"
14   can you elaborate on what you mean by service loans?
15        A    Take care of the mortgage payments, the
16   escrows, credit reporting, application of payments,
17   yearend tax and credit reporting.  Things like that.
18   That's what I mean by servicing a loan.
19        Q    So it would also send default notices?
20        A    Yes.
21        Q    And you would have this information compiled
22   in your timeline?
23        A    Yes.
24        Q    Did you review any documents prior to
25   today's deposition?

Page 22

1                              H. HANDVILLE

2          A     Yes.

3          Q     Which documents did you review?

4          A     I reviewed the foreclosure complaint, the

5     exhibits, and business records that were produced.  I

6     signed off, so obviously reviewed this in June, the

7     response to the first set of interrogatories.  I

8     looked at the servicing notes, the comment log, the

9     payment histories, the pleadings, a whole bunch of

10    assignment of mortgages for various and assorted

11    mortgages.  I looked at the first, second, and third

12    note and mortgage.  We can call them the CEMA

13    mortgages, if you would like.  And the pleadings and,

14    largely, the business records that we had available to

15    us.

16         Q     Did you also refer to your spreadsheet in

17    preparation for today's deposition?

18         A     Yes.

19                  MR. KUSHMAKOV:  I'm going to put a

20    demand on the record for the service notes, the

21    comment log, as well as the spreadsheet to be sent

22    that's pertinent to this litigation.  Other

23    information may be redacted, but we'll follow up in

24    writing.

25                  MR. YOHAY:  I assume you'll follow up

```
                                          Page 23
 1                    H. HANDVILLE
 2    in writing following the deposition.
 3              MR. KUSHMAKOV:  Yes, of course.
 4              MR. YOHAY:  We'll take it under
 5    advisement.
 6    BY MR. KUSHMAKOV:
 7       Q    And did you meet with your attorney in
 8    preparation for today's deposition?
 9       A    Yes.
10       Q    What was discussed during your meeting?
11              MR. YOHAY:  Objection.  Don't answer
12    that.  Ed, that's clearly attorney/client privileged.
13    You know better than that.
14              MR. KUSHMAKOV:  The sum and substance
15    of that conversation, but I assume would get the same
16    objection, which is fine.
17              MR. YOHAY:  It's --
18              MR. KUSHMAKOV:  How long --
19              MR. YOHAY:  That's all attorney/client
20    privilege and going to be a standing objection to
21    everything that's attorney/client privileged.  And,
22    also, if your next question is how long, I think that
23    borders on attorney/client privilege.  So I'm going to
24    direct the witness not to answer.
25              MR. KUSHMAKOV:  May I go off the record
```

```
                                            Page 24
 1                        H. HANDVILLE
 2    for just a couple minutes just to get my eye drops?
 3                    MR. YOHAY:  Sure.
 4                    REPORTER:  Sure.  Okay.  At 11:48 a.m.,
 5    we are now off the record.
 6                    (Off the record.)
 7                    REPORTER:  The time is 11:56 a.m., we
 8    are now back on the record.
 9    BY MR. KUSHMAKOV:
10        Q    Sir, are you familiar with a foreclosure
11    action entitled Central Mortgage Company against Lisa
12    Abbott?
13        A    I am.
14        Q    And how are you familiar with this action?
15        A    Well, it's the loan that we service.  And
16    it's the loan that I have been researching.  I read
17    the initial foreclosure complaint and have been
18    working on that on and off since June.
19        Q    You have been working on this file for
20    approximately one month?
21        A    No.  The reference to June was when I first
22    got involved with this loan because of the response to
23    rogs that was requested.  And then I think it was -- I
24    picked it back up again after the -- after David was
25    looking for depo dates.
```

Page 25

1                    H. HANDVILLE

2              MR. YOHAY:  I'm just going to remind

3     the witness not to disclose any attorney client

4     communications.  But you may continue, Ed.

5     BY MR. KUSHMAKOV:

6         Q    Were you done, Mr. Handville?

7         A    Yes.

8         Q    What sort of research did you do on this

9     file?

10        A    Mostly reading the documents and the

11    business records -- the pleadings.  I think I read a

12    depo transcript by Ms. Abbott taken by a different law

13    firm.  And, basically, just the business records,

14    largely.

15        Q    Can you specify which business records?

16        A    Payment histories, comment logs, images that

17    we have retained in our image repository of prior

18    servicer records -- things like demand letters,

19    inbound/outbound correspondence to the borrower,

20    things like that.

21        Q    And you reviewed all of those in preparation

22    for today's deposition?

23        A    Yes.

24             MR. KUSHMAKOV:  So we're going to make

25    a demand on the record for all documents reviewed as

```
 1                          H. HANDVILLE
 2    they pertain to the action entitled Central Mortgage
 3    Company against Lisa Abbott.  That's all that the
 4    witness has testified to reviewing for this
 5    deposition.  And so we will follow up in writing.
 6                    MR. YOHAY:  And we'll respond
 7    accordingly.
 8    BY MR. KUSHMAKOV:
 9        Q    After you performed your research, did you
10    create any documents pertaining to that research?
11        A    The only document I created was the timeline
12    spreadsheet that I started creating when we were
13    talking -- when I was talking with counsel in
14    preparation for the depo.
15        Q    Do you currently have that timeline
16    spreadsheet in front of you?
17        A    No.
18                    MR. KUSHMAKOV:  Just to make a demand
19    for that timeline spreadsheet as well to the extent
20    that it's not covered by the other demands.  And, yes,
21    we'll follow up in writing.
22                    MR. YOHAY:  And we'll certainly
23    respond.  I'll note on the record that that type of
24    document is likely going to be privileged either by
25    attorney/client and/or the work product doctrines, but
```

```
                                              Page 27
 1                    H. HANDVILLE
 2    it's something certainly we can note in our response.
 3                    MR. KUSHMAKOV:  That's something for us
 4    to discuss in the future, of course.
 5    BY MR. KUSHMAKOV:
 6         Q    So, Mr. Handville, how would you rate your
 7    familiarity with the Central Mortgage Company versus
 8    Lisa Abbott action?
 9                    MR. YOHAY:  Objection.  You can answer.
10         A    I don't know how I would rate it.  I have
11    questions.
12         Q    You have questions?
13         A    I have questions.
14         Q    And what sorts of questions do you have?
15         A    Well, they would be questions, I guess,
16    directed to Central.  What they were thinking; what
17    they were doing; why they were doing it; how did they
18    think they could do it?  Etcetera, etcetera.
19         Q    So can you summarize your research of this
20    file?
21                    MR. YOHAY:  Objection.  You can answer.
22         A    I think I already have.  I reviewed the
23    business records.
24         Q    Right.  You summarized what you researched.
25    But now I would like you to summarize your findings,
```

Page 28

1                        H. HANDVILLE

2     if any.  I apologize if I wasn't clear.

3          A    Okay.

4               MR. YOHAY:  Objection.  You can answer.

5          A    My findings are that Central didn't own the

6     loan; did not have standing to foreclose in their name

7     as the owner of the loan.  They did not have the

8     proper assignments in place prior to foreclosing.  And

9     the assignments they tried to put in place after the

10    closing with postdated -- or predated effective dates

11    as a nullity.

12         They did not have standing.  They did not have

13    the ability.  They did not have the right to foreclose

14    in their name as the owner.  And, you know, I'm not an

15    attorney, but it seems to me the entire action was a

16    nullity.

17         Q    What does that mean when you say the entire

18    action was a nullity?

19         A    They -- they should not have foreclosed in

20    the manner -- or tried to foreclose in the manner that

21    they did.  They didn't own the loan, so declaring

22    themselves the owner is inaccurate.  And according to

23    the terms of the pooling and servicing agreement, they

24    should have foreclosed in the name of the trust.  The

25    trust is the owner.  The trust has always been the

```
                                                Page 29
```

                              H. HANDVILLE

1

2    owner.  The trust has always been in possession of the

3    note since shortly after it originated.

4         Q    And who's the trust?

5         A    It's a US Bank trust.  David read off the

6    caption.  I don't have it memorized.  But, US Bank,

7    National Association, as trustee.

8         And then there's a whole bunch of "as successors

9    to," because LaSalle was merged with Bank of America.

10   And then Bank of America sold off some of their trust

11   business to US Bank.  So the trust has remained the

12   same, it's just the trustees have changed throughout

13   the years.

14        Q    So going forward, if I say, US Bank Trust,

15   that will refer to the incredibly long and complicated

16   name that Counsel Yohay has given on the record at the

17   beginning of this deposition.  That --

18        A    We -- we can say, US Bank.  The US Bank

19   Trust is the defendant.

20        Q    What is Central Mortgage Company's

21   relationship to US Bank Trust?

22        A    US Bank Trust -- the trust that owns these

23   loans -- has to have someone to service the loans.

24   Central Mortgage was simply the servicer at the time.

25        Q    Does the servicer need permission or

```
                                          Page 30
 1                      H. HANDVILLE
 2   authority from US Bank to commence foreclosure action?
 3        A    No.
 4        Q    When a servicer commences a foreclosure
 5   action, is US Bank Trust made aware?
 6        A    Yes.
 7        Q    How are they made aware?
 8        A    I believe that they are made aware by the
 9   fact that we do investor reporting on loans that are
10   in default.  And that would be how they would be
11   notified initially.
12        Q    And how soon after -- withdrawn.
13        A    I'm sorry.  That --
14        Q    No.  Withdrawn.
15        A    Oh, okay.
16        Q    I have another question.
17        A    Okay.
18        Q    Was US Bank Trust notified of the
19   foreclosure action that Central Mortgage Company
20   commenced?
21        A    I don't know specifically.  Servicers are
22   required to do investor reporting, so I would think
23   they would.
24        Q    Who would know?
25        A    But I haven't seen any documents from them.
```

Page 31

1                    H. HANDVILLE
2      The trust would know.  Somebody from that company
3      would probably know.  I don't think they would have
4      notified US Bank, at that time.  I think it was still
5      LaSalle as the trustee, at that time, just to clarify.
6      I don't think US Bank came into the picture until
7      like, maybe, 2010 or thereabouts.  But they would have
8      -- should have continued to receive investor
9      reporting, monthly reports from whoever was servicing
10     the loan at the time.
11          Q     And these monthly reports would indicate
12     that a foreclosure action has commenced on a certain
13     loan?
14          A     Generally, yes.
15          Q     And would the trust have the authority to
16     tell the servicer, the service company, to commence
17     foreclosure action?
18          A     Repeat that.
19          Q     Does US Bank Trust have the authority to
20     direct a servicer to commence a foreclosure action?
21          A     I suppose so.
22          Q     Well do you know?
23          A     They're the owner.  So they have every right
24     to speak to the servicing on a loan that's in default.
25          Q     And does the servicer have to do what the

```
                                              Page 32
  1                      H. HANDVILLE
  2   owner asks?
  3        A    Unless there's some compelling reason that
  4   we have to make them aware of that, for some reason,
  5   we can't.
  6        Q    Now US Bank Trust would have the authority
  7   to direct the servicer to discontinue a foreclosure
  8   action, correct?
  9        A    To my knowledge, yes.
 10        Q    It does, in fact, have that authority.
 11   Correct?
 12        A    I'm sorry?
 13        Q    It does, in fact, have that authority.  Is
 14   that right?
 15        A    As far as I know, it does.
 16        Q    Do you know who would know for sure?
 17        A    The trust.
 18        Q    Anyone specifically at the trust?
 19        A    I don't know anybody at US Bank.  I couldn't
 20   tell you.
 21        Q    Did Ocwen replace Central Mortgage Company
 22   as a servicer to -- well, withdrawn.  Bear with me for
 23   one moment, I have to pull...
 24                 REPORTER:  Eduard, can we go off the
 25   record?
```

```
                                              Page 33
 1                     H. HANDVILLE
 2              MR. KUSHMAKOV:  Sure.
 3              REPORTER:  At 2:12 p.m. [sic], we are
 4    now off the record.
 5                 (Off the record.)
 6              REPORTER:  And the time is 12:34 p.m.,
 7    we are now back on the record.
 8    BY MR. KUSHMAKOV:
 9        Q    Mr. Handville, the foreclosure action that
10    we were referencing, Central Mortgage versus Lisa
11    Abbott, do you know when that was filed?
12        A    I believe it was August 27, 2007.
13        Q    And who owned the note at the time it was
14    filed?
15        A    The LaSalle Trust.
16        Q    And when did US Bank Trust own the note?
17        A    The Trust always owned the note.  US Bank is
18    just the successor trustee.
19        Q    At the time -- when I say 2007 foreclosure
20    action, I will be referring to the action that we just
21    mentioned -- Cetnral Mortgage Company versus Lisa
22    Abbott.
23        A    Okay.
24        Q    So at the time the 2007 action was
25    commenced, where was the note stored?
```

```
                                              Page 34
 1                      H. HANDVILLE
 2        A     It was with LaSalle.
 3        Q     Do you know where physically?
 4        A     I don't have the -- their address memorized.
 5        Q     And where is the note stored now?
 6        A     I believe David has it.
 7        Q     David, your attorney?
 8        A     Yeah.  I believe counsel has it.  If not,
 9   Ocwen would have it.
10        Q     Why would --
11        A     I guess I should -- I guess I should say
12   PHH.  But I'm pretty sure it was sent to Houser's
13   office.
14        Q     Do you know when it was sent to Houser's
15   office?
16        A     Not off the top of my head.
17        Q     Do you know if it was sent before or after
18   the action that we're here for today was commenced?
19                   MR. YOHAY:  Objection.  Just, Ed, are
20   you referring to the action commenced by your client?
21                   MR. KUSHMAKOV:  Yeah.  The action that
22   we're here for today.
23                   MR. YOHAY:  Thank you.  You can answer.
24                   THE WITNESS:  I don't recall.
25   BY MR. KUSHMAKOV:
```

```
                                        Page 35
  1                     H. HANDVILLE
  2       Q    Would the note normally be sent to an
  3   attorney's office if an action was commenced that
  4   concerned the note?
  5       A    I don't know if it's normal, but I have seen
  6   it a number of times.  So it's not uncommon.
  7       Q    So who knows where the note is physically?
  8       A    I believe David Yohay knows.
  9       Q    Would anyone at Ocwen know?
 10       A    I would have to look at our notes to see
 11   when it was sent.
 12       Q    So the note was sent?
 13       A    Pretty sure it was.
 14       Q    Do you know who at Ocwen would know for sure
 15   whether it was?
 16       A    Anybody who pulls up the comment log and
 17   looks at the date that it was sent would see it.  I
 18   just don't happen to have that memorized.
 19       Q    When did US Bank Trust become LaSalle's
 20   successor, if you know?
 21             MR. YOHAY:  Objection.  That might have
 22   been asked and answered.  But you can answer.
 23       A    I believe it was sometime in 2010.
 24       Q    Now in 2010, would US Bank be receiving
 25   these monthly invest reports from Central Mortgage
```

```
                                            Page 36
 1                       H. HANDVILLE
 2   Company?
 3                MR. YOHAY:  Objection.  You can answer.
 4      A    They should have.  I don't know for sure.
 5      Q    Who would know for sure?
 6      A    Well, somebody at Central or somebody at US
 7   Bank.
 8                MR. KUSHMAKOV:  Can we pull up the
 9   document labeled "Abbott 2007 foreclosure"?  We'll
10   mark that as Exhibit A for identification.
11                REPORTER:  I'm sorry.  What number
12   would you like the Exhibit to be marked as?
13                MR. KUSHMAKOV:  Exhibit A or Exhibit 1.
14   It doesn't really matter to me.
15                MR. YOHAY:  Well, for the record, are
16   we doing A or 1?
17                MR. KUSHMAKOV:  I think yours were
18   marked as A, B, C.  So we'll mark mine as Exhibit 1.
19                MR. YOHAY:  Yeah.  I think generally
20   plaintiff's exhibits are numbered and defendant's are
21   lettered, but in any event.
22                (Exhibit 1 was marked for
23                identification.)
24                MR. KUSHMAKOV:  Sorry, Mr. Reporter.  I
25   was waiting on you to pull up the document.
```

```
                                              Page 37
 1                      H. HANDVILLE
 2                 REPORTER:  I -- I have not gotten ...
 3                 MR. KUSHMAKOV:  Oh, you haven't
 4    received the email?
 5                 REPORTER:  No.
 6                 MR. KUSHMAKOV:  Oh, I apologize.
 7                 MR. YOHAY:  Oh, Ed.  Can we go off the
 8    record for a second?
 9                     (Off the record.)
10                 REPORTER:  Yeah.  The time was 12:45
11    p.m. we went off the record.  It is now 12:47 p.m., we
12    are back on the record.
13    BY MR. KUSHMAKOV:
14        Q    Mr. Handville, have you seen this document
15    before?
16        A    I believe I have.
17        Q    For the record, this document has been
18    marked as plaintiff's Exhibit 1 for identification.
19    Mr. Handville, can you please what this document is?
20        A    It appears to be the summons page of the
21    foreclosure filed by Central Mortgage against the
22    borrower, Lisa Abbott.
23        Q    I'm going to scroll down to the next page.
24    And I'll represent to you that this is a 21-page
25    document that includes the summons, the complaint, as
```

```
                                              Page 38

 1                    H. HANDVILLE
 2    well as some other exhibits.  I'll give you a moment
 3    to look through it.  Please just direct me if you want
 4    me to go up a page or go down a page.
 5         A    Next page.  Next.  All right.  Hold on.
 6    Next.  Next.  Okay.  Yeah, I have seen this.
 7         Q    Should I keep going or have you seen enough?
 8         A    I have seen enough for now.
 9         Q    Okay.  Can you describe the loan that --
10    withdrawn.  Can you describe what this document this?
11              MR. YOHAY:  Objection.  You can answer.
12         A    It's the foreclosure complaint.
13         Q    And does it refer to a specific loan or
14    loans?
15         A    Yes, it refers to the Lisa Abbott loan as
16    well as the prior loans.
17         Q    How many loans in total does it refer to?
18         A    I believe there were three.
19         Q    And the foreclosure action was commenced on
20    all three or no?
21              MR. YOHAY:  Objection.  You can answer.
22         A    The foreclosure action was commenced on the
23    $645,000 mortgage, to my knowledge.
24         Q    To your knowledge, is that a consolidated
25    mortgage?
```

```
                                            Page 39
 1                    H. HANDVILLE
 2        A     Yes.
 3        Q     And do you know whose decision it was to
 4   start this action?
 5        A     Not specifically.
 6        Q     Do you know who would know?
 7        A     Somebody at Central Mortgage would know.
 8        Q     Was Central Mortgage always the servicer for
 9   this consolidated loan?
10        A     No, they were succeeded by Saxon Mortgage, I
11   believe, in 2008.  And then Ocwen Loan Servicing is in
12   2012.  And PHH in, I believe, June of 2019.
13        Q     When Ocwen became the servicer in 2012, did
14   it have a servicing agreement in place with US Bank
15   Trust?
16        A     We had -- let's see, what did we have in
17   2012?  I don't recall.  I think there would have been
18   a servicing transfer agreement between Saxon and Ocwen
19   that would speak to that.  I think it would have been
20   dated around the beginning of April 2012.
21        Q     And would there be a similar agreement
22   between Saxon and Central Mortgage Company?
23        A     I wouldn't know.
24        Q     Have you seen any servicing agreements
25   between Ocwen and US Bank Trust?
```

Page 40

```
 1                        H. HANDVILLE
 2      A     I think we provided a Power of Attorney from
 3   2019 -- might have had one earlier than that, but I
 4   think that was the most recent one.
 5      Q     The servicer and a trust, they more or less
 6   work hand-in-hand; correct?
 7                  MR. YOHAY:  Objection.  You can answer.
 8      A     To some degree, I suppose.  Mostly, it's
 9   reporting to them from the servicer's side.
10      Q     But they ultimately have the same goals;
11   right?
12                  MR. YOHAY:  Objection.  You can answer.
13      A     Well, we have a fiduciary responsibility to
14   the trust.  The trustee has a fiduciary responsibility
15   to the trust and to the certificate holders of the
16   trust.  But I think our goals are aligned as far as
17   minimizing defaults and trying to keep as many loans
18   working in a positive manner as we can.
19      Q     When Ocwen became the servicer in 2012 for
20   this consolidated loan, did it continue to pursue the
21   2007 foreclosure action?
22                  MR. YOHAY:  Objection.  You can answer.
23      A     To my knowledge, they did continue that,
24   yes.
25      Q     And Ocwen would prepare monthly reports to
```

```
                                          Page 41
 1                      H. HANDVILLE
 2   US Bank Trust; correct?
 3        A    Correct.
 4        Q    Have you seen any of these reports?
 5        A    No.
 6        Q    Do you know if they exist?
 7        A    We're required to provide monthly reports.
 8   I can only assume that they exist.  I have not
 9   visually seen them.
10        Q    As a loan analyst, do you don't provide or
11   prepare these reports; correct?
12        A    No, I don't.
13        Q    So who provides and prepares these reports?
14        A    Largely, our counsel does.  And they send
15   them to us and then we parse them into our reports.
16        Q     When you say, "us," do you mean to Ocwen or
17   do you mean to the loan analysts?
18        A    I mean to the servicer.
19        Q    The servicer.
20        A    Yeah.
21        Q    So who of the servicer receives it?
22               MR. YOHAY:  Objection.
23        A    I'm not sure I understand the question.
24               MR. YOHAY:  Eddie, I was going to ask
25   you to repeat, as well.
```

```
                                              Page 42
 1                      H. HANDVILLE
 2              MR. KUSHMAKOV:  Okay.
 3              MR. YOHAY:  Thank you.
 4  BY MR. KUSHMAKOV:
 5      Q    Mr. Handville, you testified that these
 6  reports would be sent to the servicer; correct?
 7              MR. YOHAY:  Objection.
 8      A    When the attorneys are doing them, yes.
 9      Q    And if the attorneys are not involved, the
10  servicer would create these reports on its own;
11  correct?
12      A    Correct.
13      Q    Now in this case, by "this case," I'm
14  referring to the 2007 foreclosure action, Ocwen
15  prepared reports to your knowledge; correct?
16      A    To my knowledge, yes.
17      Q    Who, at Ocwen, would prepare these reports?
18      A    I don't know specifically, but we do have an
19  investor reporting department.  So I'm thinking that
20  they would be involved.
21      Q    As a loan servicer, do you interact with the
22  investor reporting department?
23      A    I don't personally, but our loan servicing
24  area has departments that interact with the investors.
25      Q    Do you know who the supervisor is of the
```

```
                                              Page 43
 1                       H. HANDVILLE
 2    loan servicing department -- withdrawn.  Do you know
 3    who the supervisor is of the investor reporting
 4    department?
 5         A    No.
 6         Q    Do you know who would know?
 7         A    Well, I guess Robert Fisher would know.
 8         Q    How do you spell Robert Fisher's last name?
 9         A    F-I-S-H-E-R.
10         Q    And what is Robert Fisher's title?
11         A    I believe he is the foreclosure manager.
12         Q    Are you familiar with his duties?
13         A    No.
14              MR. KUSHMAKOV:  I'd just like to put on
15    the record that we will require the deposition of
16    Robert Fisher.  He may have knowledge that is relevant
17    to plaintiff's action.  And therefore we'll follow up
18    in writing with a deposition notice for Robert Fisher.
19    Of course, defense counsel will respond.
20              MR. YOHAY:  We'll take it under
21    advisement.
22    BY MR. KUSHMAKOV:
23         Q    Do you know who would have seen these
24    monthly reports at Ocwen?
25         A    No.
```

```
                                        Page 44

 1                      H. HANDVILLE

 2       Q     And as a loan analyst, you compile these

 3   reports, correct?

 4              MR. YOHAY:  Objection.  You can answer.

 5       A     What was that question again?

 6       Q     Withdrawn.  At the time Ocwen became the

 7   servicer of this consolidated loan, who owned the

 8   note?

 9       A     The trust.

10       Q     And when you say, "the trust," you mean US

11   Bank trust; correct?

12       A     Yes.

13       Q     At the time Ocwen became the servicer, where

14   was the note physically located?

15       A     I don't know.

16       Q     Who would know?

17       A     Well, I could tell you if I looked at the

18   comments.  The real servicing comments would have

19   indication as to requests for the documents.

20       Q     Would you like to take a look at those

21   comments now?

22       A     If you want me to.

23       Q     Please do.

24       A     Do you have them?  Are you going to put them

25   on the screen?
```

```
                                          Page 45
 1                    H. HANDVILLE
 2      Q    I don't believe I have them.  Let me just
 3   double check that.
 4                MR. YOHAY:  Ed, by counsel -- are we
 5   off the record?
 6                REPORTER:  Yeah.  Yeah.  We're off.
 7                (Off the record.)
 8                REPORTER:  The time is 1:02 p.m., we
 9   went off the record.  It is now 1:06 p.m., we are now
10   back on the record.
11   BY MR. KUSHMAKOV:
12      Q    What I have on the screen right now is --
13                MR. KUSHMAKOV:  Well, it should be
14   marked as Plaintiff's Exhibit 2 for identification.
15                (Exhibit 2 was marked for
16                identification.)
17   BY MR. KUSHMAKOV:
18      Q    Plaintiff's Exhibit 2 contains defendant's
19   responses to plaintiff's first request for production
20   of documents.  This is a 245-page document that would
21   be dated June 18th, 2021.  Mr. Handville, I ask you to
22   take a look at pages that are bate stamped USB407,
23   408, and 409.
24           Do you see these pages?
25      A    Yes.  Could you scroll down a little bit?
```

Page 46

```
 1                        H. HANDVILLE
 2    Oh that's the end?  Okay.
 3        Q    Yeah.  One moment.  I think I have the wrong
 4    one up.  Let me pause for just a second.  It's the
 5    right document, just the wrong window.  One moment.
 6             Okay.  I think that's that.
 7        A    So to answer your question, US Bank was in
 8    possession of the trust -- was in possession of the
 9    original note when the loan boarded with Ocwen.
10        Q    You're basing it on plaintiff's Exhibit 2,
11    bate stamped USB407 through 409; correct?
12        A    Yes.
13        Q    At the time Ocwen became the servicer of
14    this loan, did Ocwen's loss mitigation division
15    communicate with the borrower on this consolidated
16    loan?
17        A    Yes.
18        Q    How so?
19        A    They sent out correspondence; they made
20    phone calls; they made contact with the borrower and
21    discussed alternatives with her.
22        Q    Do you know who made those phone calls?
23        A    Not off the top of my head.
24        Q    Do you know who would know?
25        A    Could refer to the comments.  There may be
```

```
                                              Page 47
  1                    H. HANDVILLE
  2    information in there as to the caller and the
  3    information.  No one's going to know off the top of
  4    their head without referring to the comments, so.
  5        Q    Of course.  When Ocwen becomes a servicer on
  6    a loan, does it have a certain procedure that it
  7    follows upon receiving the file?
  8                    MR. YOHAY:  Objection.  You can answer.
  9        A    I'm not sure what you mean by procedure.
 10    Could you be more specific what you're asking?
 11        Q    Sure.  So when Ocwen receives -- withdrawn.
 12    When Ocwen becomes the servicer on a loan, what is the
 13    first step that it takes, if any?
 14        A    Ocwen will notify the borrowers of the
 15    service transfer.  The prior servicer should have as
 16    well, ahead of time.  So Ocwen will send out,
 17    generally, a welcome letter.
 18            It will also try to make contact, certainly,
 19    on loans that are in default.  They reach out to the
 20    borrowers immediately.  They send them their notices.
 21            They send them -- during the servicing --
 22    the escrow analysis letters or any loan related
 23    information such as a -- you know, a 1098 form or
 24    things like that.  And then they verify that taxes and
 25    insurance are paid or are being paid or need to be
```

```
                                             Page 48
 1                      H. HANDVILLE
 2    paid, as the case may be.  So they'll audit those
 3    items.
 4            They try to reach out -- if there's no
 5    evidence of insurance -- to the borrower get evidence
 6    if they have hazard or flood or whatever the case may
 7    be.  They double check the taxes and pay them if they
 8    need to be.  They will send out notices to the
 9    borrower if we don't receive evidence of insurance
10    that they're going to force place coverage.  And then
11    after several notices, they send them a copy of the
12    policy that they bought and charged to the escrow
13    account.  Other than that, they continue with loss
14    mitigation efforts until such time as there's no
15    reason to continue them.
16        Q    And when they determine there's no reason to
17    continue with loss mitigation efforts, what do they do
18    next?
19        A    Just continue with foreclosure.
20        Q    Now for the sake of clarity, I'm just trying
21    to understand, would loss mitigation efforts run
22    parallel to a foreclosure action?
23        MR. YOHAY:  Objection.  You can answer.
24        A    They run parallel in the fact that they're
25    occurring in the same timeline.  I mean, loss
```

                            H. HANDVILLE

1    mitigation can start before foreclosure if the

2    borrower responds and we can work something out to

3    that -- you know, to avoid a foreclosure.  But once

4    it's in foreclosure, loss mitigation continues.

5             If the borrower expresses an interest, we

6    assist them with getting a request for mortgage

7    assistance completed.  So that they can apply and give

8    us an idea of what their financial situations are; the

9    reason for the default; give us an idea of what their

10   capabilities are.  And depending on what they're

11   looking for, address it accordingly.

12        Q    Mm-hm.

1             H. HANDVILLE

2    mitigation can start before foreclosure if the

3    borrower responds and we can work something out to

4    that -- you know, to avoid a foreclosure.  But once

5    it's in foreclosure, loss mitigation continues.

6             If the borrower expresses an interest, we

7    assist them with getting a request for mortgage

8    assistance completed.  So that they can apply and give

9    us an idea of what their financial situations are; the

10   reason for the default; give us an idea of what their

11   capabilities are.  And depending on what they're

12   looking for, address it accordingly.

13        If the borrower does submit a completed -- we'll

14   call it RMA, request for mortgage assistance -- then,

15   at that point in time, once a completed package is

16   deemed received, then they will put foreclosure

17   activity on hold while they process it.

18        Q    Mm-hm.

19        A    At some point in time, they decision it.

20   Assuming the decision is a positive one, they give

21   them a period of time to execute, let's say a

22   modification agreement, as an example.  And make the

23   initial payment in certified funds, or whatever the

24   agreement calls for.

25             If the borrower does not execute it, at a

```
                                            Page 50
 1                      H. HANDVILLE
 2   certain point in time shortly after it's been sent
 3   out, it's deemed to be rejected by the borrower.  And
 4   then there's a 30-day hold period for a modification
 5   appeal, if they are denied the mod.  And then upon the
 6   expiration of that 30-day appeal, if the borrower
 7   doesn't appeal it, then they just pick up and resume
 8   foreclosure where they left off.
 9              So there's no dual tracking or anything like
10   that.  They just happen to coincide in the same exact
11   timeframe.  Because once a loan's in default that's
12   when you do loss mit., largely.
13        Q    You said, "continue with foreclosure," a few
14   times in the course of this deposition.  When you say,
15   "continue with foreclosure," do you mean continue with
16   the foreclosure action that's already filed or
17   something else?
18        A    In -- in this case, that's what I mean.
19   They're not stopping the foreclosure completely or
20   dismissing it completely at that point in time.  They
21   just put everything on hold.  You know --
22        Q    So they don't take proactive steps to
23   continue litigating an already pending foreclosure
24   action if loss mitigation is having, you know, some
25   discussions with the borrower.  Is that right?
```

1    H. HANDVILLE

2        A    If the borrower has sent in a -- what's

3    considered a completed package, then all action is on

4    hold.

5        Q    Now in relation to this cause, the

6    consolidated loan that was the subject of the 2007

7    foreclosure action, can you describe the loss

8    mitigation efforts that were taken?

9        A    Well, I do recall seeing several

10   communications to the borrower.  I noticed them in the

11   comments as well.  Largely, what I took from reading

12   the notes and loss mitigation offers that were made,

13   is that the borrower really couldn't do anything

14   because she didn't have title to the property anymore

15   and didn't live in it.  So it didn't seem to her to

16   make a whole lot of sense to enter into a modification

17   on a loan that she doesn't control the asset or, you

18   know, own it.

19       Q    Do you recall the date that you read or

20   learned -- withdrawn.  Is there a specific record that

21   tells you this?

22       A    Between our imaged documents and the

23   comments, it kind of paints a picture of the loss

24   mitigation efforts.

25       Q    Were any reports generated in response to

```
                                              Page 52

 1                         H. HANDVILLE
 2      these loss mitigation efforts?
 3           A    I'm --
 4                     MR. YOHAY:  Note my objection.  I'm
 5      sorry.  You can continue.
 6           A    I'm not aware of any type of reports in
 7      relation to loss mitigation efforts.
 8           Q    Are reports generally generated in response
 9      to loss mitigation efforts?
10           A    I'm not aware if they are.
11           Q    Are records kept summarizing or detailing or
12      memorializing loss mitigation efforts?
13           A    Well, the comment log and the correspondence
14      would be memorializations of those efforts.
15           Q    Anything else?
16           A    That's the only thing that comes to mind.
17           Q    At the time Ocwen became the servicer for
18      this loan, did it have communications pertaining to
19      this loan with US Bank Trust?
20           A    Would do you mean by "communications"?
21           Q    Emails, reports, phone calls, anything of
22      the sort, pertaining to this loan.
23           A    There would have been, like I said, the
24      monthly default reports.  Outside of that, I can't
25      think of anything off the top of my head.
```

1                    H. HANDVILLE

2       Q    Other than the investor reporting

3   department, would anyone else communicate with US Bank

4   Trust?

5       A    I can't think of anybody else that would be

6   communicating with them.  I suppose it's possible, but

7   I can't think of anybody off the top of my head.

8       Q    Do you know who would know?

9       A    Somebody at the trust would know.

10      Q    Who at the trust?

11      A    I don't know.  I don't know anybody at the

12  trust.  I guess I should correct that and say the

13  trustee.

14      Q    And when you say trust or trustee, you're

15  referring to US Bank Trust?

16      A    Correct.

17      Q    The owner of the note.

18      A    Correct.

19      Q    Got it.

20              MR. KUSHMAKOV:  Can we take about five

21  minutes?  I need to rest my eyes and ...

22              REPORTER:  Sure.

23              MR. YOHAY:  Sure.

24              REPORTER:  The time is 1:23 p.m., we

25  are now off the record.

```
                                              Page 54

 1                         H. HANDVILLE

 2                    (Off the record.)

 3                    REPORTER:  The time was 1:23 p.m. we

 4      were off the record.  At 1:35 p.m., we are now back on

 5      the record.

 6      BY MR. KUSHMAKOV:

 7          Q    When Ocwen began servicing the note in --

 8      withdrawn.  When Ocwen began servicing the loan in

 9      2012, did it also maintain the 2007 foreclosure

10      action?

11                    MR. YOHAY:  Objection.  You can answer.

12          A    Yes.

13          Q    Was Central Mortgage Company still involved

14      in the 2007 foreclosure action after Ocwen began

15      servicing?

16          A    No.

17          Q    Mr. Handville, earlier you testified that

18      you had questions for Central Mortgage Company.  Can

19      you elaborate what you meant by that.

20                    MR. YOHAY:  Objection.  Asked and

21      answered.  But you can answer.

22          A    Well, I questioned why they didn't follow

23      the terms of the Pooling and Servicing Agreement.  And

24      have the loan assigned to the trust and foreclose in

25      the trust's name like they were supposed to.  I
```

```
                                              Page 55
 1                       H. HANDVILLE
 2    questioned why they filed assignment of mortgages
 3    after the foreclosure complaint was filed with
 4    effective dates going back to originations, or
 5    thereabouts.
 6              So I had some question as to why a servicer
 7    would take that type of an approach in a foreclosure
 8    for a -- a loan that's in a securitized trust.  They
 9    didn't have the right to do it.  The trust should have
10    been the foreclosing party.
11                   MR. KUSHMAKOV:  Off the record briefly.
12                   (Off the record.)
13                   REPORTER:  The time was 1:38 p.m., we
14    went off the record.  At 1:41 p.m. we are back on the
15    record.
16    BY MR. KUSHMAKOV:
17       Q    Mr. Handville, you mentioned assigning the
18    loan to the trust and then commencing the action
19    earlier for a Pooling and Servicing Agreement.  Do you
20    mean assigning the loan to LaSalle, US Bank, or
21    someone else?
22                   MR. YOHAY:  Objection.  You can answer.
23       A    It would be assigning the mortgage to the
24    trust, is what I was referring to.
25       Q    Oh, I apologize.  I didn't...
```

```
                                            Page 56

  1                      H. HANDVILLE

  2      A     So at the time Central was involved, it

  3   would have been -- should have been assigned to the

  4   LaSalle as trustee for the trust.

  5      Q     When US Bank Trust -- withdrawn.  When was

  6   this discovered?

  7               MR. YOHAY:  Objection.  When was what

  8   discovered?

  9   BY MR. KUSHMAKOV

 10      Q     When was it discovered that Central Mortgage

 11   allegedly did not abide by the Pooling and Servicing

 12   Agreement?

 13      A     I don't know.  That's a conclusion that I

 14   came to.

 15      Q     When did you come to that conclusion?

 16      A     This week in looking at the business

 17   records.

 18      Q     Which records did you look at?

 19      A     Pooling and Servicing Agreement, Foreclosure

 20   complaint.

 21      Q     Other than your attorney, have you spoken

 22   with anyone about this conclusion that you came to?

 23      A     No.

 24      Q     Mr. Handville, if I could direct your

 25   attention to Plaintiff's Exhibit 2.  It's marked for
```

```
                                             Page 57
  1                        H. HANDVILLE
  2    identification.  Specifically, two pages bate stamped
  3    as USB450 and 451.  I ask that you take a moment to
  4    look at these two pages.
  5         A    I have seen these.
  6         Q    Now you just said that you have seen these.
  7    After looking at these two pages, can you tell us
  8    where you have seen these?
  9         A    I think they might be part of our document
 10    production.  Isn't the first time I have seen them.
 11                   MR. YOHAY:  Mr. Court Reporter, can you
 12    read back the last question and answer?  I think my
 13    audio cut out --
 14                   REPORTER:  Sure.
 15                   MR. YOHAY:  -- so I wasn't able to hear
 16    it.  Yeah, thank you.
 17                   (The reporter replayed the record as
 18                   requested.)
 19                   MR. YOHAY:  Please proceed.
 20    BY MR. KUSHMAKOV:
 21         Q    Okay.  When is the first time you have seen
 22    them?
 23         A    July 22nd, I believe.  No, let's see.  No, I
 24    think it was in June.  Might have been part of the
 25    exhibits for the June response to interrogatories.
```

```
                                            Page 58

 1                     H. HANDVILLE

 2       Q    Okay.  Can you tell us what this document

 3   is?

 4       A    It is the -- it says that, basically, they

 5   are seeking to discontinue the foreclosure action and

 6   vacate the notice of pendency canceling it.

 7       Q    And do you know why this decision was

 8   reached?

 9               MR. YOHAY:  Objection.  You can answer.

10       A    I do not.

11       Q    Do you know who would know?

12       A    Probably Clarfield and Okon.

13       Q    The attorneys?

14       A    Yes.

15       Q    Do you know who at Ocwen would know?

16       A    Not off the top of my head.

17       Q    Was Ocwen involved in this decision?

18       A    Oh, yes.

19       Q    Who at Ocwen was involved in this decision?

20       A    Would be somebody in our foreclosure group.

21       Q    Earlier you mentioned that the gentleman by

22   the name of Robert Fisher was the foreclosure manager.

23   Is he in the foreclosure group?

24               MR. YOHAY:  Objection.  You can answer.

25       A    He -- he manages the -- the group.
```

```
                                              Page 59
 1                   H. HANDVILLE
 2      Q    Okay.  So Robert Fisher would know why a
 3  decision was made to discontinue the 2007 foreclosure
 4  action; right.
 5              MR. YOHAY:  Objection.  You can answer.
 6      A    I don't know what he would know.  He would
 7  be looking at generally the same records I would be
 8  looking at.  Ideally, there would have been some sort
 9  of communications between foreclosure counsel and
10  Ocwen.  So perhaps there's an email somewhere that
11  speak to it that, obviously, I don't have access to at
12  the moment.
13      Q    So it would make sense to speak to someone
14  from the foreclosure group to figure this out; right?
15              MR. YOHAY:  Objection.  You can answer.
16      A    Possibly the foreclosure group or maybe even
17  our IT group to see about retrieving emails or
18  something.  See if there's any records on their end.
19              MR. KUSHMAKOV:  I'm going to take a few
20  minutes just to review my notes.  Can we take about
21  ten?
22              REPORTER:  Sure.
23              MR. KUHSMAKOV:  See if there's anything
24  left.
25              REPORTER:  Sure.
```

```
                                            Page 60

 1                       H. HANDVILLE

 2               MR. YOHAY:  Sure.

 3               MR. KUSHMAKOV:  Thank you.

 4               MR. YOHAY:  Thanks Ed.

 5               REPORTER:  And 1:52 p.m., we are off

 6    the record.

 7                    (Off the record.)

 8               REPORTER:  Ready when you are.

 9    BY MR. KUSHMAKOV:

10        Q    Mr. Handville at the time in 2007

11    foreclosure action was commenced, who was the holder

12    of the mortgage?

13        A    The trust.

14        Q    And at the time the 2007 foreclosure action

15    was commenced, was Central Mortgage Company the

16    custodian of the note?

17        A    No.

18               MR. YOHAY:  Objection you could answer.

19    BY MR. KUSHMAKOV:

20        Q    Who was?

21        A    LaSalle.

22        Q    And how do you know?

23        A    It's there stated as such in the pooling and

24    servicing agreement.

25        Q    And what page of the client servicing
```

```
                                              Page 61

 1                         H. HANDVILLE

 2    agreement is that stated?

 3         A    I'd have to pour through it to find it.

 4         Q    No problem.  I can pull it up.  It's marked

 5    as Exhibit 3.  I think right David?

 6                   MR. YOHAY:  I don't know if you marked

 7    Exhibit 3.

 8                   MR. KUSHMAKOV:  This your rule 26 --

 9                   MR. YOHAY:  Has that been marked?  Or

10    are you going to mark it.

11                   MR. KUSHMAKOV:  No, I'm going to mark

12    it.

13                   MR. YOHAY:  Okay sure.

14                   MR. KUSHMAKOV:  I don't think I've

15    emailed this this, so it's not going to be in your

16    email.

17                   MR. YOHAY:  I have it.

18                   MR. KUSHMAKOV:  Okay.

19                   MR. YOHAY:  I have a copy yeah.

20    BY MR. KUSHMAKOV:

21         Q    I've just got to screen share.  Mr.

22    Handville the document that you currently have in

23    front of you is marked as Plaintiff's Exhibit 3 for

24    identification.  It is a 264 page document which is

25    part of U.S. Bank Trust's Rule 26(a)(1) Initial
```

Page 62

1                          H. HANDVILLE
2      Disclosures document as a whole is dated January 13,
3      2021.   I would like to direct your attention to the
4      page that is Bates stamped as USB 46, if you please
5      take a moment to look at it.   Do you see the document
6      in front of you?
7                          (Plaintiff's Exhibit 3 was marked for
8                          identification.)
9           A     I do.
10          Q     Okay.   Earlier you mentioned pooling and
11     servicing agreement.   Is that what this document is?
12          A     Yes.
13          Q     And is it maintained by Ocwen?
14          A     I know it's maintained by the trust, but
15     Ocwen has a copy of it, so I guess if we have a copy
16     of it we maintain it.
17          Q     And have you seen this document before?
18          A     I have.
19          Q     When have you seen it?
20          A     I saw it in June, and I saw it on the 22nd
21     of July.
22          Q     Now earlier you testified that there are
23     certain clauses in here that Central Mortgage Company
24     allegedly did not adhere to.   By scrolling through the
25     table of contents will that help you identify where

Page 63

1                       H. HANDVILLE
2    those clauses are?
3        A     No.  Those clauses -- let me address the
4    question you posed earlier about custodian.
5        Q     Sure.
6        A     On USB 77 it designates the custodian as
7    LaSalle Bank National Association.  So, one, two,
8    third from the bottom of page 26 or USB 77.  There you
9    go.  Regarding your last question I believe USB 110
10   and 111, or 59 and 60 of the actual document itself.
11       Q     Mr. Handville you have a copy of this
12   document in front of you, correct?  I'm assuming
13   that's what you referred?
14       A     Yes.
15       Q     Okay.  So I'll stop.  So let's, I'm sorry.
16       A     So on the top of page 59 with respect to
17   each mortgage loan, the original mortgage note
18   endorsed without recourse and proper form to the
19   lender, to the order of LaSalle Bank National
20   Association, and it stipulates the name of the trust,
21   or in blank with all necessary intervening
22   endorsements.
23             And then down, let's see here, the bottom of
24   page 60 speaks to the MERS loans, and recording them
25   with MERS.

```
                                          Page 64

 1                    H. HANDVILLE
 2        Q    Okay.  So let's see if we can take this one
 3   at a time.  If we can jump back to USB 777, I believe
 4   page 29.
 5        A    77?
 6        Q    I'm sorry page 26 if you would, yes 77.
 7   Let's see if we can unpack the section that says
 8   custodian.  If you don't mind sharing that into the
 9   record.
10        A    "Custodian.  Person who is at anytime
11   appointed by the depositor as custodian of the
12   mortgage documents and the trustee mortgage files.
13   The initial custodian is LaSalle Bank National
14   Association."
15        Q    What is the meaning of an initial custodian?
16        A    It means he was the custodian at the time
17   the trust was set up.
18        Q    And who was the depositor?
19        A    Bear with me.  Morgan Stanley Capital One
20   Inc.
21        Q    What is your understanding of the
22   relationship between a depositor and a custodian?
23        A    I'm not sure that there is a relationship
24   between a depositor and a custodian other than the
25   depositor provides all the documents necessary to be
```

```
                                              Page 65
 1                      H. HANDVILLE
 2   submitted to the trust.  The custodian is where those
 3   documents are housed on behalf of the trust.
 4        Q    On behalf of the trust you said?
 5        A    Correct.
 6        Q    Is it accurate that a custodian can also
 7   appoint a depositor?  I'm sorry withdrawn.  Is it
 8   accurate that a depositor could appoint the custodian?
 9        A    I don't know.
10        Q    I'm going to ask you to read the first
11   sentence of the custodian section to yourself one more
12   time.  What is your understanding of that sentence?
13                  MR. YOHAY:  Objection.
14                  THE WITNESS:  Are you talking about USB
15   77?
16   BY MR. KUSHMAKOV:
17        Q    Correct.
18        A    What is my understanding?  My understanding
19   is that LaSalle was designated as a custodian.
20   LaSalle National Bank was designated as a custodian
21   for the trust at its inception.
22        Q    And who designated LaSalle as the custodian?
23        A    I don't know.
24        Q    If you go down to the bottom of page 26 of
25   USB 77, there's something called a cut-off date.  Do
```

```
                                                Page 66
 1                      H. HANDVILLE
 2    you know what that is?
 3                 MR. YOHAY:  Objection.  You can answer.
 4                 THE WITNESS:  That's the date of the
 5    pool.  That's the date the trust was created.
 6    BY MR. KUSHMAKOV:
 7         Q    Do you review and analyze pooling and
 8    servicing agreements as part of your daily duties?
 9         A    I review them.
10         Q    Do you interpret pooling and servicing
11    agreements?
12         A    As best I can sometimes, sure.
13         Q    And is your interpretation of pooling and
14    servicing agreements final, or can your interpretation
15    be overruled by someone else?
16                 MR. YOHAY:  Objection, you can answer.
17                 THE WITNESS:  Oh my interpretation
18    there's nothing binding about it.  It's just what I
19    take from reading the documents and trying to
20    extrapolate a little bit of logic from them.
21    BY MR. KUSHMAKOV:
22         Q    If I could just ask you to read just the
23    first sentence of the custodian section into the
24    record.
25         A    On USB 77?
```

```
                                          Page 67
 1                      H. HANDVILLE
 2       Q    Correct.
 3       A    The same one I've read three times now?
 4   "Custodian.  Person who is at any time appointed by
 5   the depositor as the custodian of the mortgage
 6   documents and the trustee mortgage files.  The initial
 7   custodian is LaSalle Bank National Association."
 8       Q    To clarify, I only asked you the first
 9   sentence, but that's fine.  I don't believe you've
10   answered my question earlier, so I will pose it again.
11   What is your understanding of the meaning of the first
12   sentence of the custodian section on USB 77?
13                 MR. YOHAY:  Objection asked and
14   answered, but you can answer again.
15                 MR. KUSHMAKOV:  His answer was not
16   responsive, but.
17                 MR. YOHAY:  That's your interpretation,
18   but he can answer.
19                 MR. KUSHMAKOV:  He didn't speak about
20   the second sentence, so that's fine.
21                 THE WITNESS:  Well in reading this it
22   does appear that it says a person who is at anytime
23   appointed by the depositor as a custodian of the
24   mortgage documents and the trustee mortgage files.
25   This indicates that the depositor gets to appoint the
```

```
                                            Page 68
 1                      H. HANDVILLE
 2   custodian.
 3   BY MR. KUSHMAKOV:
 4       Q    Are you aware of another custodian being
 5   appointed?
 6       A    I believe U.S. Bank is the custodian at this
 7   time.
 8       Q    How was U.S. Bank appointed as the
 9   custodian?
10       A    They took over.  They became the successor
11   trustee on this trust.
12       Q    Is there a pooling and servicing agreement
13   indicating such?
14       A    There is likely some sort of documents that
15   memorialize the changing of the guard so to speak.  I
16   have not reviewed those, but usually there's one or
17   more documents that memorialize a change.  Sometimes
18   it's an assignment or a release related type document.
19   It depends on the trust and the wording of the
20   specific changes, but yeah, I'm sure we have something
21   that speaks to that.
22       Q    Do you know who would know for sure?
23       A    Not off the top of my head.  I'd go in and
24   look in the file.  Just like anybody else that you
25   could ask that question to would do, and see if we can
```

```
                                            Page 69
 1                        H. HANDVILLE
 2    find it.
 3         Q     Do you know who's responsible for
 4    maintaining the files of let's call them custodial
 5    appointments?
 6         A     Yeah, we have somebody in our legal
 7    department that has been tasked over the years with
 8    maintaining them and making sure that we have accurate
 9    copies and what not.  I don't know that she's charged
10    with that or not, but she's the person that we go to
11    sometimes to ask for these things.  Her name is Jolene
12    Stratton.
13         Q     Can you spell her name please?
14         A     S-T-R-A-T-T-O-N.  But we have a SharePoint
15    drive where many of us can access those type of
16    business records.  I can access them.
17         Q     Sure.  But you can't necessarily interpret
18    them, is that right?
19         A     Oh I do the best I can.
20                    MR. YOHAY:  Objection.
21    BY MR. KUSHMAKOV:
22         Q     Now a loan add on typically would not work
23    with pooling and servicing agreements, correct?
24                    MR. YOHAY:  Objection.  You can answer.
25                    THE WITNESS:  Um, we would occasionally
```

```
                                        Page 70
                          H. HANDVILLE
 1
 2    when I was in that department, we would occasionally.
 3    BY MR. KUSHMAKOV:
 4         Q    And what would be the extent of your work
 5    with these such documents?
 6         A    Proving standing.
 7         Q    Sorry can you repeat that?
 8         A    Providing standing.
 9         Q    Providing standing.
10         A    In a foreclosure action.
11         Q    Is Miss Stratton an attorney within the
12    legal department, or someone else?
13         A    No.  She's not an attorney.
14         Q    What's her title?
15         A    Oh I don't know.  I'd have to look it up.
16         Q    Referring back to USB 77.  Do you know who
17    would know whether the depositor appointed another
18    custodian of the note?
19         A    I haven't seen any documentation indicating
20    anybody else at that time was appointed as a
21    custodian.  The pooling and servicing agreement speaks
22    specifically to the parties and their
23    responsibilities.
24         Q    Is a pooling servicing agreement assigned a
25    servicer?
```

```
                                          Page 71

1                        H. HANDVILLE

2        A     Yeah.  Usually they do at least initially.

3        Q     What do you mean by initially?

4        A     Well services change over the course of

5   time, so there's subsequent services, just like

6   there's subsequent trustees when those change.  I

7   don't know if this one specifies or not who services

8   the loans.

9        Q     Does this agreement specify who services the

10  loans?

11       A     That's what I'm looking at.  I don't think

12  it does.  I don't remember seeing anything in here

13  specifying the servicer.  Go ahead and look.

14  Sometimes there's more than one.

15       Q     How is the servicer generally appointed?

16             MR. YOHAY:  Objection, you can answer.

17             THE WITNESS:  They're appointed by the

18  trust.  I don't know.

19  BY MR. KUSHMAKOV:

20       Q     Do you know who would know?

21       A     The trust.

22       Q     Do you know how Central Mortgage Company

23  came to be appointed as a servicer?

24       A     No I don't.  They're not listed under the

25  servicer section.
```

Page 72

1                    H. HANDVILLE

2        Q    Do pooling and servicing agreements have

3    effective dates?

4        A    They have an opening date and a closing

5    date.  Effective date would basically be the date of

6    the trust, which I think in this case was June 1, July

7    1 of '07.  I'd have to go back and look at the date.

8    January 1 of '07.  We just looked at it a minute ago.

9    I forget where it is, the cut-off date.  January 1,

10   '07.

11       Q    And that's the date the initial agreement,

12   this service agreement initially began, correct?

13                 MR. YOHAY:  Objection, you can answer.

14                 THE WITNESS:  Correct.

15   BY MR. KUSHMAKOV:

16       Q    Are there any signatures on the servicing

17   agreement?

18       A    Bear with me I'm scrolling.

19       Q    Take your time.

20       A    No.

21       Q    Do you know whether this servicing agreement

22   was ever signed?

23       A    I don't know.

24       Q    So it's possible that Central Mortgage

25   company was in fact custodian of the note at the time

```
                                              Page 73
 1                       H. HANDVILLE
 2     the 2007 foreclosure action was filed, correct?
 3                    MR. YOHAY:  Objection.
 4                    THE WITNESS:  I don't see how that's
 5     possible.
 6     BY MR. KUSHMAKOV:
 7         Q    Why not?
 8         A    I don't see them listed in the pooling and
 9     service agreement.
10         Q    The pooling and servicing agreement that
11     we've been referring to that you testified is
12     unsigned, and you don't know whether it's actually in
13     effect?
14         A    Correct.
15                    MR. YOHAY:  Objection.
16     BY MR. KUSHMAKOV:
17         Q    Do you know when Central Mortgage Company
18     began the servicer of the mortgage -- withdrawn.  Let
19     me rephrase that.  When did Central Mortgage Company
20     become the servicer for the loan that is the subject
21     of the 2007 foreclosure action?
22                    MR. YOHAY:  Objection, you can answer.
23                    THE WITNESS:  I believe it was shortly
24     after the loan originated, but I don't have a specific
25     date.
```

```
                                              Page 74

   1                      H. HANDVILLE

   2     BY MR. KUSHMAKOV:

   3          Q    And what is your basis for that belief?

   4          A    Well I think I looked at their payment

   5     history.

   6          Q    Have any payments been made on this loan?

   7          A    I didn't look.

   8          Q    Okay.  You don't know.

   9               MR. YOHAY:  Objection, you can answer.

  10               THE WITNESS:  Off the top of my head I

  11     don't recall.

  12     BY MR. KUSHMAKOV:

  13          Q    Okay.  What is your basis -- withdrawn.

  14     Earlier you testified that LaSalle was the holder of

  15     the note that is the subject of the 2007 foreclosure

  16     action.  What is your basis for that --

  17          A    The basis for what?  I'm sorry I didn't

  18     catch the last?

  19          Q    For the belief that LaSalle was the holder

  20     of the note from the --

  21               MR. YOHAY:  Objection.  Ed can you just

  22     start over with whatever you're trying to ask because

  23     I think it got kind of muddled, so it might be easier.

  24               MR. KUSHMAKOV:  Yeah sorry, my eyes

  25     are.
```

```
                                          Page 75
 1                    H. HANDVILLE
 2              MR. YOHAY:  I know, but if you could
 3   just restart with a clear question that would be
 4   appreciated.
 5              MR. KUSHMAKOV:  Yeah, yeah, yes.
 6              MR. YOHAY:  Thank you.
 7   BY MR. KUSHMAKOV:
 8      Q    What is your basis for the belief that
 9   LaSalle was in physical possession of the note at the
10   time the 2007 foreclosure action was commenced?
11              MR. YOHAY:  Objection, you can answer.
12              THE WITNESS:  Well because they were
13   the designated custodian for the trust at that time.
14              MR. KUSHMAKOV:  Can we take five
15   everybody and then we'll come back to wrap this up.
16              MR. YOHAY:  Okay sure.
17              MR. KUSHMAKOV:  Thank you.
18              REPORTER:  Okay.
19              (Off the record.)
20              THE WITNESS:  Before we proceed,
21   addressing the last question you asked me.
22              MR. KUSHMAKOV:  What was the last
23   question I asked you?
24              THE WITNESS:  Oh you were asking me how
25   I knew LaSalle was the custodian.
```

```
                                          Page 76

 1                         H. HANDVILLE

 2                    MR. KUSHMAKOV:  Sure.

 3                    THE WITNESS:  I think one of the

 4     exhibits that you've marked, I don't know which one,

 5     the black screen, it looked like screen prints.

 6     There's a couple of black screens with some writing on

 7     it that talked about the no possession history.

 8                         It's one of the ones that was

 9     introduced earlier in this depo, and that talks to

10     when the trust first obtained the note in October of

11     '06, and LaSalle sending it out, et cetera, et cetera,

12     so there was all that evidence in the note possession

13     history screens.

14     BY MR. KUSHMAKOV:

15          Q    Are you referring to the green text on black

16     background to comments, correct?  What we had

17     mentioned earlier okay?

18          A    Yes.

19          Q    Do you know who generated those comments?

20          A    I'm sorry?

21          Q    Do you know who generated those comments?

22          A    No I don't, but I know what department does

23     that.

24          Q    What department does that?

25          A    That's our records services department
```

```
                                        Page 77
 1                    H. HANDVILLE
 2   tasked with reaching out to the trusts and confirming
 3   the possession history.
 4        Q    Do you know who at the record services
 5   department created that comment?
 6        A    I couldn't tell by looking at that comment.
 7   I could probably tell by looking in the system, but I
 8   couldn't tell you by looking at the comment itself.
 9        Q    Okay.  And do you know what they based that
10   comment on?
11        A    What date what?
12        Q    What they -- withdrawn.  The basis for their
13   knowledge?
14        A    They contact the trustee directly, email.
15        Q    And do you know which trustee they
16   contacted?
17        A    It would have been U.S. Bank.
18        Q    So someone had U.S. Bank would be providing
19   the information that was in that comment, correct?
20        A    Correct.
21        Q    Do you know who at U.S. Bank was providing
22   the information that was in that comment?
23        A    No.
24        Q    Do you know the source of their knowledge
25   for the information that was in that comment?
```

```
                                              Page 78

 1                      H. HANDVILLE
 2                MR. YOHAY:  Objection, you can answer.
 3                THE WITNESS:  Being the employee of the
 4   trust, no I don't.
 5   BY MR. KUSHMAKOV:
 6      Q    Do you know what documents they had in their
 7   possession to create that comment when I say --
 8   withdrawn.  Let me rephrase that question.  Do you
 9   know what documents the record services department had
10   in their possession, if any, that they used to
11   generate that comment?
12                MR. YOHAY:  Objection, you can answer.
13                THE WITNESS:  The records would have
14   been received from the trustee.
15   BY MR. KUSHMAKOV:
16      Q    And do you know what the contents of those
17   records were?
18      A    Just what was reiterated in those comments
19   that they put in the system.  It's all I'm aware of.
20      Q    So you never seen any of the documents that
21   were used to generate those comments, correct?
22                MR. YOHAY:  Objection, you can answer.
23                THE WITNESS:  There weren't any
24   documents generated.  That is just a reply that
25   they're putting in there from the trust.
```

```
                                                  Page 79

 1                       H. HANDVILLE

 2    BY MR. KUSHMAKOV:

 3        Q    So the information was obtained via phone

 4    call?

 5        A    Email.

 6        Q    And do you have a copy of that email?

 7        A    I do not.

 8        Q    Have you ever seen that email?

 9        A    I have not.

10        Q    So you don't know what information was used

11    to generate that comment?

12                 MR. YOHAY:  Objection, you can answer.

13                 THE WITNESS:  If you're talking about

14    the information the trustee looked at, they have

15    records.  They have all sort of tracking records, but

16    I don't know specifically what they would have looked

17    at.

18    BY MR. KUSHMAKOV:

19        Q    And you haven't seen any of those documents

20    for yourself, correct?

21                 MR. YOHAY:  Objection, you can answer.

22                 THE WITNESS:  No.

23    BY MR. KUSHMAKOV:

24        Q    Okay.  That just about does it for my

25    questions today.  Mr. Handville thank you so much for
```

```
                                         Page 80

 1                    H. HANDVILLE

 2    your time.

 3        A     Thank you sir.

 4              MR. KUSHMAKOV:  Counsel, a few things

 5    before we go.

 6              MR. YOHAY:  And I will state Eduard

 7    before we go off, once you're done I also have a

 8    statement to make as well, but.

 9              MR. KUSHMAKOV:  Sure.

10              MR. YOHAY:  Yeah.

11              MR. KUSHMAKOV:  So I will reserve my

12    right to make further document demands, some of which

13    we have already mentioned, others which we will be

14    make following our review of the transcript to the

15    extent that those documents point to necessitate to

16    bring back Mr. Handville, reserve our right to do so.

17    Furthermore, we also request the depositions of Jolene

18    Stratton, Robert Fischer, and someone from the record

19    services department.

20              As this deposition has shown, Mr.

21    Handville despite his knowledge, was not able to

22    answer several questions that were pertinent to our

23    action.  He was unable to tell us with certainty who

24    had the loan, why they had -- who was in physical

25    possession of the note, why they were in physical
```

```
                                              Page 81

 1                      H. HANDVILLE
 2   possession of the note.  He was unable to tell us why
 3   the action was discontinued amongst other things such
 4   as also not being in a position to make any decisions.
 5                  Therefore, we reserve our right to
 6   determine whether we will be following-up with
 7   deposition notices for again Miss Stratton, Mr.
 8   Fischer and someone from the record services
 9   department.
10                  MR. YOHAY:  Okay.  So on behalf of
11   Defendant we certainly object to, and dispute your
12   characterization of what Mr. Handville's testimony
13   shows today.  In so far as your further requests,
14   please make them all in writing of course, and
15   everything will be taken under advisement.
16                  And then just pursuant to FRCP 30E,
17   Defendant requests a copy of Mr. Handville's
18   deposition transcript, and an opportunity for Mr.
19   Handville to make any changes as necessary.  That's
20   all I have.  Thank you.
21                  MR. KUSHMAKOV:  Okay off the record.
22                  REPORTER:  Okay.
23                  (Whereupon, at 2:56 p.m. the proceeding
24                  was concluded.
25
```

Page 82

1                    CERTIFICATE OF DEPONENT

2

3            I, HOWARD HANDVILL, have read the foregoing

4    transcript of my deposition and except for any corrections

5    or changes noted on the errata sheet, I hereby

6    subscribe to the transcript as an accurate record

7    of the statements made by me.

8

9

                     _____

10                       HOWARD HANDVILL

11

12   SUBSCRIBED AND SWORN before and to me

13   this _____ day of _____, 20___.

14

15   _____
                      NOTARY PUBLIC

16

17

18

19

20   My Commission expires:

21

22

23

24

25

Page 83

1                    CERTIFICATE OF NOTARY PUBLIC

2              I, SILAS SHELLEY, the officer before whom the

3       foregoing proceedings were taken, do hereby certify that

4       any witness(es) in the foregoing proceedings, prior to

5       testifying, were duly sworn; that the proceedings were

6       recorded by me and thereafter reduced to typewriting by a

7       qualified transcriptionist; that said digital audio

8       recording of said proceedings are a true and accurate

9       record to the best of my knowledge, skills, and ability;

10      that I am neither counsel for, related to, nor employed by

11      any of the parties to the action in which this was taken;

12      and, further, that I am not a relative or employee of any

13      counsel or attorney employed by the parties hereto, nor

14      financially or otherwise interested in the outcome of this

15      action.

16

17

18

19

20        SILAS SHELLEY
        Notary Public in and for the

21          State of New York

22

23

24

25

Page 84

1              CERTIFICATE OF NOTARY PUBLIC

2          I, KARI RUSINKO, the officer before whom the

3     foregoing proceedings were taken, do hereby certify that

4     any witness(es) in the foregoing proceedings, prior to

5     testifying, were duly sworn; that the proceedings were

6     recorded by me and thereafter reduced to typewriting by a

7     qualified transcriptionist; that said digital audio

8     recording of said proceedings are a true and accurate

9     record to the best of my knowledge, skills, and ability;

10    that I am neither counsel for, related to, nor employed by

11    any of the parties to the action in which this was taken;

12    and, further, that I am not a relative or employee of any

13    counsel or attorney employed by the parties hereto, nor

14    financially or otherwise interested in the outcome of this

15    action.

16

17

18

19      KARI RUSINKO

     Notary Public in and for the

20       State of New York

21

22

23

24

25

Page 85

1                    CERTIFICATE OF TRANSCRIBER

2          I, JESSICA BLOWERS, do hereby certify that this

3    transcript was prepared from the digital audio recording of

4    the foregoing proceeding, that said transcript is a true

5    and accurate record of the proceedings to the best of my

6    knowledge, skills, and ability; that I am neither counsel

7    for, related to, nor employed by any of the parties to the

8    action in which this was taken; and, further, that I am not

9    a relative or employee of any counsel or attorney employed

10   by the parties hereto, nor financially or otherwise

11   interested in the outcome of this action.

12

13

14     JESSICA BLOWERS

15

16

17

18

19

20

21

22

23

24

25

Page 86

1                    CERTIFICATE OF TRANSCRIBER

2            I, HELEN VENTURINI, do hereby certify that this

3    transcript was prepared from the digital audio recording of

4    the foregoing proceeding, that said transcript is a true

5    and accurate record of the proceedings to the best of my

6    knowledge, skills, and ability; that I am neither counsel

7    for, related to, nor employed by any of the parties to the

8    action in which this was taken; and, further, that I am not

9    a relative or employee of any counsel or attorney employed

10   by the parties hereto, nor financially or otherwise

11   interested in the outcome of this action.

12

13   *Helen Venturini*

14   HELEN VENTURINI

15

16

17

18

19

20

21

22

23

24

25

Page 87

1        **ERRATA SHEET**
       **VERITEXT LEGAL SOLUTIONS**
2

  CASE NAME: Article 13 LLC  v. Central Mortgage Company.,Et Al.
3  DATE OF DEPOSITION: 7/27/2021
  WITNESSES' NAME: Howard Handville
4
5   PAGE  LINE (S)   CHANGE     REASON
  ____|_____|_____|_____
6
  ____|_____|_____|_____
7
  ____|_____|_____|_____
8
  ____|_____|_____|_____
9
  ____|_____|_____|_____
10
  ____|_____|_____|_____
11
  ____|_____|_____|_____
12
  ____|_____|_____|_____
13
  ____|_____|_____|_____
14
  ____|_____|_____|_____
15
  ____|_____|_____|_____
16
  ____|_____|_____|_____
17
  ____|_____|_____|_____
18
  ____|_____|_____|_____
19
  ____|_____|_____|_____
20
21            _____
           Howard Handville
22  SUBSCRIBED AND SWORN TO BEFORE ME
  THIS ____ DAY OF _____, 20__.
23
24
  _____    _____
25  (NOTARY PUBLIC)     MY COMMISSION EXPIRES:

[03553 - advisement]                                                    Page 1

**0**

**03553**   1:7
**06**   76:11
**07**   72:7,8,10

**1**

**1**   3:8,12 36:13,16
  36:18,22 37:18
  61:25 72:6,7,8,9
**100**   7:18
**10001**   1:19
**10165**   2:19
**1098**   47:23
**110**   63:9
**111**   63:10
**11415**   2:6
**11:19**   1:17 4:10
**11:48**   24:4
**11:56**   24:7
**12:34**   33:6
**12:47**   37:11
**13**   1:4 2:2 4:9 5:9
  6:7 62:2 87:2
**1661**   7:18
**17264**   86:13
**18th**   45:21
**1:02**   45:8
**1:06**   45:9
**1:20**   1:7
**1:23**   53:24 54:3
**1:35**   54:4
**1:38**   55:13
**1:41**   55:14
**1:52**   60:5

**2**

**2**   3:9 45:14,15,18
  46:10 56:25
**20**   82:13 87:22
**2007**   3:8 10:18
  33:12,19,24 36:9
  40:21 42:14 51:6

54:9,14 59:3
  60:10,14 73:2,21
  74:15 75:10
**2007-2ax**   2:14,15
  5:16,17
**2008**   39:11
**2010**   8:5 10:10,12
  10:18 31:7 35:23
  35:24
**2012**   14:8 39:12,13
  39:17,20 40:19
  54:9
**2019**   10:2 39:12
  40:3
**2021**   1:16 4:11
  45:21 62:3
**21**   37:24
**22nd**   57:23 62:20
**2330**   2:18
**24**   7:10
**245**   45:20
**26**   3:12 61:8,25
  63:8 64:6 65:24
**26256**   83:19
**26262**   84:18
**264**   61:24
**26936**   85:13
**27**   1:16 4:11 33:12
**29**   64:4
**2:12**   33:3
**2:56**   81:23

**3**

**3**   3:12 61:5,7,23
  62:7
**30**   50:4,6
**300**   2:5
**30e**   81:16
**33409**   7:19
**36**   3:8

**4**

**408**   45:23
**409**   45:23 46:11
**42nd**   2:18
**45**   3:11
**451**   57:3
**46**   62:4

**5**

**59**   63:10,16

**6**

**6**   3:3,13
**60**   2:18 63:10,24
**645,000**   38:23

**7**

**7/27/2021**   87:3
**77**   63:6,8 64:5,6
  65:15,25 66:25
  67:12 70:16
**777**   64:3

**8**

**80-02**   2:5

**a**

**a.m.**   1:17 4:10
  24:4,7
**abbott**   3:8 24:12
  25:12 26:3 27:8
  33:11,22 36:9
  37:22 38:15
**abide**   56:11
**ability**   7:12 15:24
  28:13 83:9 84:9
  85:6 86:6
**able**   57:15 80:21
**abn**   10:13,14,16
  10:22 11:6,11,14
**absent**   4:16
**access**   59:11 69:15
  69:16

**account**   48:13
**accurate**   65:6,8
  69:8 82:6 83:8
  84:8 85:5 86:5
**acknowledgeme...**
  4:5
**action**   1:6 6:8 13:6
  16:13,15 17:2,7,9
  17:15 24:11,14
  26:2 27:8 28:15
  28:18 30:2,5,19
  31:12,17,20 32:8
  33:9,20,20,24
  34:18,20,21 35:3
  38:19,22 39:4
  40:21 42:14 43:17
  48:22 50:16,24
  51:3,7 54:10,14
  55:18 58:5 59:4
  60:11,14 70:10
  73:2,21 74:16
  75:10 80:23 81:3
  83:11,15 84:11,15
  85:8,11 86:8,11
**actions**   9:7 14:2
**active**   17:25
**activity**   21:11
  49:17
**actual**   63:10
**add**   69:22
**additional**   13:2
  18:9
**additionally**   4:16
**address**   7:15,16,20
  34:4 49:12 63:3
**addressing**   75:21
**adhere**   62:24
**administer**   4:6
**advisement**   23:5
  43:21 81:15

**ago** 72:8
**agree** 4:13,18
**agreement** 28:23
39:14,18,21 49:22
49:24 54:23 55:19
56:12,19 60:24
61:2 62:11 68:12
70:21,24 71:9
72:11,12,17,21
73:9,10
**agreements** 39:24
66:8,11,14 69:23
72:2
**ahead** 10:15 47:16
71:13
**al** 87:2
**alcohol** 7:9
**aligned** 40:16
**allegedly** 56:11
62:24
**alliance** 1:9
**alternatives** 46:21
**america** 2:11 5:13
29:9,10
**amro** 10:13
**analysis** 47:22
**analyst** 8:8,10,16
8:17,20,20,23,24
8:24 12:19,23,25
13:2,4,24 14:6
41:10 44:2
**analyst's** 13:21
**analysts** 13:14,15
13:23 14:9,15
17:11 41:17
**analyze** 66:7
**answer** 11:19 14:3
14:11,14,24 17:8
18:15 19:9 20:12
21:7 23:11,24
27:9,21 28:4

34:23 35:22 36:3
38:11,21 40:7,12
40:22 44:4 46:7
47:8 48:23 54:11
54:21 55:22 57:12
58:9,24 59:5,15
60:18 66:3,16
67:14,15,18 69:24
71:16 72:13 73:22
74:9 75:11 78:2
78:12,22 79:12,21
80:22
**answered** 35:22
54:21 67:10,14
**answers** 6:15
**anybody** 32:19
35:16 53:5,7,11
68:24 70:20
**anymore** 51:14
**anytime** 64:10
67:22
**apologize** 12:15
28:2 37:6 55:25
**appeal** 50:5,6,7
**appear** 67:22
**appearances** 9:5
**appearing** 5:4 9:4
**appears** 37:20
**applicable** 4:22
**application** 18:24
20:18 21:16
**apply** 49:8
**appoint** 65:7,8
67:25
**appointed** 64:11
67:4,23 68:5,8
70:17,20 71:15,17
71:23
**appointments**
69:5

**appreciated** 75:4
**approach** 16:24
55:7
**appropriate** 19:10
**approximately**
24:20
**april** 39:20
**area** 42:24
**article** 1:4 2:2 4:9
5:9 6:7 87:2
**asked** 35:22 54:20
67:8,13 75:21,23
**asking** 6:9,22
15:17 18:18 47:10
75:24
**asks** 32:2
**aspect** 15:4
**asset** 51:17
**assigned** 4:3 13:5
54:24 56:3 70:24
**assigning** 55:17,20
55:23
**assignment** 18:10
22:10 55:2 68:18
**assignments** 28:8
28:9
**assist** 15:20 49:7
**assistance** 49:8,14
**association** 1:8
2:10,11,13 5:12,13
5:15 29:7 63:7,20
64:14 67:7
**assorted** 22:10
**assume** 6:24 22:25
23:15 41:8
**assuming** 7:22
49:20 63:12
**attached** 3:16
**attention** 56:25
62:3

**attorney** 6:6,11
23:7,12,19,21,23
25:3 26:25 28:15
34:7 40:2 56:21
70:11,13 83:13
84:13 85:9 86:9
**attorney's** 35:3
**attorneys** 42:8,9
58:13
**audio** 57:13 83:7
84:7 85:3 86:3
**audit** 10:23 11:3
48:2
**august** 8:4 10:10
10:12 33:12
**authority** 13:25
16:11 30:2 31:15
31:19 32:6,10,13
**authorized** 4:5
16:9
**available** 22:14
**avoid** 49:4
**aware** 30:5,7,8
32:4 52:6,10 68:4
78:19

| **b** |
| --- |

**b** 3:6 36:18
**back** 9:25 11:21
16:24 19:7 24:8
24:24 33:7 37:12
45:10 54:4 55:4
55:14 57:12 64:3
70:16 72:7 75:15
80:16
**background** 19:24
20:2 76:16
**bank** 1:7,11 2:9,11
2:12 5:11,12,14
29:5,6,9,10,11,14
29:18,18,21,22
30:2,5,18 31:4,6

[bank - coincide]

31:19 32:6,19
33:16,17 35:19,24
36:7 39:14,25
41:2 44:11 46:7
52:19 53:3,15
55:20 56:5 61:25
63:7,19 64:13
65:20 67:7 68:6,8
77:17,18,21
**banking** 1:10
**based** 77:9
**basically** 10:9
20:22 25:13 58:4
72:5
**basing** 46:10
**basis** 74:3,13,16
74:17 75:8 77:12
**bate** 45:22 46:11
57:2
**bates** 62:4
**beach** 7:19
**bear** 32:22 64:19
72:18
**began** 54:7,8,14
72:12 73:18
**beginning** 17:2
29:17 39:20
**behalf** 2:2,9 5:9,11
9:8 16:10 17:10
65:3,4 81:10
**belief** 74:3,19 75:8
**believe** 11:13 14:7
30:8 33:12 34:6,8
35:8,23 37:16
38:18 39:11,12
43:11 45:2 57:23
63:9 64:3 67:9
68:6 73:23
**best** 6:23 19:14
66:12 69:19 83:9
84:9 85:5 86:5

**better** 8:12 23:13
**binding** 66:18
**bit** 13:18,21 19:4
45:25 66:20
**black** 76:5,6,15
**blank** 63:21
**blowers** 85:2,14
**boarded** 20:23
46:9
**boating** 12:6
**borders** 23:23
**borrower** 15:24
16:18 17:24 25:19
37:22 46:15,20
48:5,9 49:3,6,13
49:25 50:3,6,25
51:2,10,13
**borrower's** 16:21
**borrowers** 13:11
15:20 16:6,8 17:3
21:2 47:14,20
**bottom** 63:8,23
65:24
**bought** 48:12
**break** 6:19,20
**breaking** 20:8
**briefly** 55:11
**bring** 17:6 80:16
**broker** 12:14,16
**brooklyn** 13:8
**bulk** 13:5,22
**bunch** 13:11 22:9
29:8
**business** 7:16,20
9:19,21,22 11:3,21
13:12 14:10,18,21
14:23,25 15:19
22:5,14 25:11,13
25:15 27:23 29:11
56:16 69:16

**c**

**c** 2:1 36:18
**call** 17:22 18:4
19:21 20:14 22:12
49:14 69:4 79:4
**called** 5:23 11:14
65:25
**caller** 47:2
**calls** 17:5 46:20,22
49:24 52:21
**canceling** 58:6
**capabilities** 49:11
**capital** 64:19
**caption** 29:6
**care** 21:15
**case** 42:13,13 48:2
48:6 50:18 72:6
87:2
**cases** 13:8
**catch** 74:18
**caught** 15:23
**cause** 9:6 10:8
51:5
**cema** 22:12
**central** 1:8 4:10
24:11 26:2 27:7
27:16 28:5 29:20
29:24 30:19 32:21
33:10 35:25 36:6
37:21 39:7,8,22
54:13,18 56:2,10
60:15 62:23 71:22
72:24 73:17,19
87:2
**certain** 31:12 47:6
50:2 62:23
**certainly** 26:22
27:2 47:18 81:11
**certainty** 80:23
**certificate** 40:15
82:1 83:1 84:1

85:1 86:1
**certificates** 2:15
5:17
**certification** 12:13
**certifications**
11:23 12:11
**certified** 4:18 9:8
49:23
**certify** 83:3 84:3
85:2 86:2
**cetera** 76:11,11
**cetnral** 33:21
**change** 68:17 71:4
71:6 87:5
**changed** 29:12
**changes** 68:20
81:19 82:5
**changing** 68:15
**characterization**
81:12
**charged** 9:2 48:12
69:9
**check** 45:3 48:7
**checking** 18:8
**civil** 1:6
**clarfield** 58:12
**clarify** 31:5 67:8
**clarity** 48:20
**clauses** 62:23 63:2
63:3
**clear** 28:2 75:3
**clearly** 23:12
**client** 23:12,19,21
23:23 25:3 26:25
34:20 60:25
**closing** 11:4 28:10
72:4
**closings** 10:25
**cmac** 11:15
**coincide** 50:10

**collection** 17:16
　17:17
**collections** 15:14
**college** 10:7
**come** 16:24 19:5
　56:15 75:15
**comes** 13:25 52:16
**commence** 30:2
　31:16,20
**commenced** 30:20
　31:12 33:25 34:18
　34:20 35:3 38:19
　38:22 60:11,15
　75:10
**commences** 30:4
**commencing**
　55:18
**comment** 22:8,21
　25:16 35:16 52:13
　77:5,6,8,10,19,22
　77:25 78:7,11
　79:11
**comments** 44:18
　44:18,21 46:25
　47:4 51:11,23
　76:16,19,21 78:18
　78:21
**commission** 82:20
　87:25
**communicate**
　46:15 53:3
**communicating**
　53:6
**communications**
　18:23 25:4 51:10
　52:18,20 59:9
**company** 1:9 4:10
　9:25 10:13 11:2
　11:14,15 20:4
　24:11 26:3 27:7
　30:19 31:2,16

32:21 33:21 36:2
　39:22 54:13,18
　60:15 62:23 71:22
　72:25 73:17,19
　87:2
**company's** 29:20
**compelling** 32:3
**compile** 44:2
**compiled** 20:13
　21:21
**complaint** 22:4
　24:17 37:25 38:12
　55:3 56:20
**complete** 18:11
**completed** 49:8,13
　49:15 51:3
**completely** 50:19
　50:20
**complicated** 29:15
**concepts** 19:16
**concern** 4:12
**concerned** 35:4
**concluded** 81:24
**conclusion** 56:13
　56:15,22
**confirming** 77:2
**considered** 21:4
　51:3
**consolidated**
　38:24 39:9 40:20
　44:7 46:15 51:6
**constitute** 5:2
**construction** 11:9
**consultant** 11:8
**contact** 16:19,20
　46:20 47:18 77:14
**contacted** 77:16
**contained** 20:15
**contains** 45:18
**contents** 62:25
　78:16

**continue** 16:18
　25:4 40:20,23
　48:13,15,17,19
　50:13,15,15,23
　52:5
**continued** 31:8
**continues** 49:5
**control** 10:23,24
　51:17
**conversation**
　23:15
**copies** 69:9
**copy** 48:11 61:19
　62:15,15 63:11
　79:6 81:17
**corp** 1:10
**corporation** 7:25
　9:9
**correct** 7:20 10:15
　13:3 16:7 32:8,11
　40:6 41:2,3,11
　42:6,11,12,15 44:3
　44:11 46:11 53:12
　53:16,18 63:12
　65:5,17 67:2
　69:23 72:12,14
　73:2,14 76:16
　77:19,20 78:21
　79:20
**corrections** 82:4
**correspondence**
　17:4 25:19 46:19
　52:13
**counsel** 14:19 16:9
　18:3,6,8 26:13
　29:16 34:8 41:14
　43:19 45:4 59:9
　80:4 83:10,13
　84:10,13 85:6,9
　86:6,9

**counsels** 9:12
**couple** 10:6 24:2
　76:6
**course** 20:6,10
　23:3 27:4 43:19
　47:5 50:14 71:4
　81:14
**courses** 10:7
**court** 1:1 6:12,13
　6:17 9:5 57:11
**courts** 18:12
**coverage** 48:10
**covered** 26:20
**create** 26:10 42:10
　78:7
**created** 26:11 66:5
　77:5
**creating** 26:12
**credit** 21:16,17
**current** 12:19
**currently** 8:9
　12:12 26:15 61:22
**custodial** 69:4
**custodian** 60:16
　63:4,6 64:8,10,11
　64:13,15,16,22,24
　65:2,6,8,11,19,20
　65:22 66:23 67:4
　67:5,7,12,23 68:2
　68:4,6,9 70:18,21
　72:25 75:13,25
**cut** 57:13 65:25
　72:9
**cv** 1:7

**d**

**d** 3:1
**daily** 66:8
**databases** 9:17
**date** 1:16 35:17
　51:19 65:25 66:4
　66:5 72:4,5,5,5,7,9

72:11 73:25 77:11
87:3
**dated**  39:20 45:21
62:2
**dates**  10:19 24:25
28:10 55:4 72:3
**david**  2:16 5:10
24:24 29:5 34:6,7
35:8 61:5
**day**  13:9 50:4,6
82:13 87:22
**de**  1:10
**deciding**  18:9
**decision**  13:25
14:16 17:6 39:3
49:19,20 58:7,17
58:19 59:3
**decisions**  14:10,18
81:4
**declaring**  28:21
**deed**  16:3
**deemed**  49:16
50:3
**default**  15:21,25
16:20 17:4,22
21:19 30:10 31:24
47:19 49:10 50:11
52:24
**defaulted**  13:11
**defaults**  40:17
**defendant**  5:11
29:19 81:11,17
**defendant's**  3:9,12
36:20 45:18
**defendants**  1:12
2:9
**defense**  17:24
43:19
**degree**  40:8
**demand**  22:20
25:18,25 26:18

**demands**  26:20
80:12
**denied**  50:5
**department**  8:25
17:16,17,23,23
19:10,13 42:19,22
43:2,4 53:3 69:7
70:2,12 76:22,24
76:25 77:5 78:9
80:19 81:9
**departments**
42:24
**depending**  15:23
16:23 49:11
**depends**  14:25
15:12,15 16:24
68:19
**depo**  24:25 25:12
26:14 76:9
**deponent**  82:1
**deposition**  1:14
4:8,24 21:25
22:17 23:2,8
25:22 26:5 29:17
43:15,18 50:14
80:20 81:7,18
82:4 87:3
**depositions**  9:7
13:19 80:17
**depositor**  64:11,18
64:22,24,25 65:7,8
67:5,23,25 70:17
**describe**  8:14
18:13 19:18 38:9
38:10 51:7
**describing**  8:22
**description**  3:7
**designate**  16:10
**designated**  65:19
65:20,22 75:13

**designates**  63:6
**despite**  80:21
**detailing**  52:11
**determine**  16:20
48:16 81:6
**different**  15:3,5,7
19:12 25:12
**difficult**  10:8
**digital**  83:7 84:7
85:3 86:3
**direct**  23:24 31:20
32:7 38:3 56:24
62:3
**directed**  27:16
**directly**  16:6,8
77:14
**disclose**  25:3
**disclosure**  11:4
**disclosures**  3:13
62:2
**discontinue**  32:7
58:5 59:3
**discontinued**  81:3
**discount**  16:2
**discovered**  56:6,8
56:10
**discovery**  13:20
**discuss**  27:4
**discussed**  21:4
23:10 46:21
**discussions**  50:25
**dismissing**  50:20
**dispute**  81:11
**district**  1:1,2
**division**  15:18
17:18,20 19:19
46:14
**divisions**  15:3,6,7
**doctrines**  26:25
**document**  26:11
26:24 36:9,25

37:14,17,19,25
38:10 45:20 46:5
57:9 58:2 61:22
61:24 62:2,5,11,17
63:10,12 68:18
80:12
**documentation**
18:8 70:19
**documents**  3:11
9:3,17 11:4,5 18:9
21:24 22:3 25:10
25:25 26:10 30:25
44:19 45:20 51:22
64:12,25 65:3
66:19 67:6,24
68:14,17 70:5
78:6,9,20,24 79:19
80:15
**doing**  8:25 14:16
20:19 27:17,17
36:16 42:8
**double**  45:3 48:7
**drive**  69:15
**driver's**  12:5
**drops**  24:2
**drugs**  7:9
**dual**  50:9
**due**  4:12
**duly**  5:23 83:5
84:5
**duties**  8:11,19,22
20:6,10 43:12
66:8
**dyohay**  2:20

|  e  |
| :---: |

**e**  2:1,1,18 3:1,6
43:9
**earlier**  10:20 40:3
54:17 55:19 58:21
62:10,22 63:4
67:10 74:14 76:9

76:17
easier 74:23
eastern 1:2
easy 13:7
ed 8:15 11:24
  23:12 25:4 34:19
  37:7 45:4 60:4
  74:21
eddie 41:24
eduard 2:3,7 5:8
  6:6 32:24 80:6
education 10:4,5
effect 73:13
effective 28:10
  55:4 72:3,5
efforts 19:2 48:14
  48:17,21 51:8,24
  52:2,7,9,12,14
either 14:18 26:24
elaborate 21:14
  54:19
email 19:22,23
  37:4 59:10 61:16
  77:14 79:5,6,8
emailed 61:15
emails 52:21 59:17
employed 7:22,24
  8:2 10:10,14,16
  83:10,13 84:10,13
  85:7,9 86:7,9
employee 78:3
  83:12 84:12 85:9
  86:9
employer 11:14
endorsed 63:18
endorsements
  63:22
entails 8:14
enter 51:16
entire 28:15,17

entitled 24:11 26:2
errata 82:5 87:1
es 83:4 84:4
escrow 15:15
  47:22 48:12
escrows 21:16
esquire 2:3,16
et 76:11,11 87:2
etcetera 9:7 15:17
  27:18,18
event 36:21
everybody 75:15
evidence 48:5,5,9
  76:12
evidentiary 4:23
exact 50:10
examination 3:2
  6:3
examined 5:25
example 13:9
  49:22
execute 9:8 49:21
  49:25
execution 9:2
exhibit 3:8,9,12
  36:10,12,13,13,18
  36:22 37:18 45:14
  45:15,18 46:10
  56:25 61:5,7,23
  62:7
exhibits 3:16 22:5
  36:20 38:2 57:25
  76:4
exist 41:6,8
expiration 50:6
expires 82:20
  87:25
expresses 49:6
extent 26:19 70:4
  80:15

external 9:17
extrapolate 66:20
eye 24:2
eyes 53:21 74:24

**f**

f 43:9
fact 30:9 32:10,13
  48:24 72:25
failed 7:7
fairly 14:22
familiar 24:10,14
  43:12
familiarity 27:7
far 32:15 40:16
  81:13
federal 1:11
feel 6:19
fiduciary 40:13,14
figure 59:14
figures 13:13
  18:10
file 18:12 24:19
  25:9 27:20 47:7
  68:24
filed 33:11,14
  37:21 50:16 55:2
  55:3 73:2
files 64:12 67:6,24
  69:4
final 66:14
financial 7:25 8:3
  15:23 49:9
financially 83:14
  84:14 85:10 86:10
find 11:22 20:4
  61:3 69:2
findings 27:25
  28:5
fine 23:16 67:9,20
firm 25:13

first 3:10 5:23 8:4
  22:7,11 24:21
  45:19 47:13 57:10
  57:21 65:10 66:23
  67:8,11 76:10
fischer 80:18 81:8
fisher 43:7,16,18
  58:22 59:2
fisher's 43:8,10
fitno 18:5
five 53:20 75:14
flood 48:6
florida 7:19
follow 22:23,25
  26:5,21 43:17
  54:22
following 23:2
  80:14 81:6
follows 5:25 47:7
forbearance 15:22
force 48:10
foreclose 18:5
  28:6,13,20 54:24
foreclosed 28:19
  28:24
foreclosing 28:8
  55:10
foreclosure 3:8
  9:6 13:5,6,22 14:2
  15:2,11 16:4,13,15
  17:2,7,9,12,15,20
  18:3,3,6 19:19,25
  20:25,25 22:4
  24:10,17 30:2,4,19
  31:12,17,20 32:7
  33:9,19 36:9
  37:21 38:12,19,22
  40:21 42:14 43:11
  48:19,22 49:2,4,5
  49:16 50:8,13,15
  50:16,19,23 51:7

54:9,14 55:3,7
56:19 58:5,20,22
58:23 59:3,9,14,16
60:11,14 70:10
73:2,21 74:15
75:10
**foreclosures**   13:11
17:21 19:21
**foregoing**   82:3
83:3,4 84:3,4 85:4
86:4
**forget**   72:9
**form**   47:23 63:18
**forward**   29:14
**four**   11:16
**frcp**   81:16
**free**   6:20
**frequently**   14:20
**front**   26:16 61:23
62:6 63:12
**funds**   49:23
**further**   80:12
81:13 83:12 84:12
85:8 86:8
**furthermore**
80:17
**future**   27:4

**g**

**gap**   10:21 11:10
11:11,13,17,18
**gardens**   2:5,6
**ged**   10:6
**general**   9:14 19:2
20:19
**generally**   13:7
14:12,17 31:14
36:19 47:17 52:8
59:7 71:15
**generate**   11:2
78:11,21 79:11

**generated**   51:25
52:8 76:19,21
78:24
**gentleman**   58:21
**getting**   49:7
**give**   38:2 49:8,10
49:20
**given**   20:20 29:16
**go**   10:15 13:8 19:7
23:25 32:24 37:7
38:4,4 63:9 65:24
68:23 69:10 71:13
72:7 80:5,7
**goals**   40:10,16
**god**   10:19
**going**   6:9,13,24
22:19 23:20,23
25:2,24 26:24
29:14 37:23 38:7
41:24 44:24 47:3
48:10 55:4 59:19
61:10,11,15 65:10
**good**   4:2 5:17 6:5
**gotten**   37:2
**green**   76:15
**group**   58:20,23,25
59:14,16,17
**guard**   68:15
**guess**   27:15 34:11
34:11 43:7 53:12
62:15

**h**

**h**   3:6 4:1 5:1 6:1
7:1 8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1

32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1 42:1 43:1,9
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1
**hand**   5:20 40:6,6
**handle**   13:15,23
16:2
**handles**   17:9
**handling**   13:22
**handvill**   82:3,10
**handville**   1:15 4:1
4:9 5:1,6,7,22 6:1
6:5 7:1 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1,6 26:1 27:1,6
28:1 29:1 30:1
31:1 32:1 33:1,9
34:1 35:1 36:1
37:1,14,19 38:1
39:1 40:1 41:1
42:1,5 43:1 44:1
45:1,21 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1

54:1,17 55:1,17
56:1,24 57:1 58:1
59:1 60:1,10 61:1
61:22 62:1 63:1
63:11 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1,25 80:1
80:16,21 81:1,19
87:3,21
**handville's**   81:12
81:17
**happen**   35:18
50:10
**hard**   11:22 20:3
**hazard**   48:6
**head**   6:16,16
34:16 46:23 47:4
52:25 53:7 58:16
68:23 74:10
**hear**   57:15
**hearing**   5:18
**hearings**   9:6
**helen**   86:2,14
**help**   15:23 62:25
**hereto**   83:13 84:13
85:10 86:10
**high**   10:6
**highest**   10:5
**histories**   22:9
25:16
**history**   9:13 74:5
76:7,13 77:3
**hm**   49:18
**hold**   38:5 49:17
50:4,21 51:4
**holder**   60:11
74:14,19

| | | | |
|---|---|---|---|
| **holders** 40:15 | **informed** 6:11 | **investors** 42:24 | **know** 6:20 13:18 |
| **hours** 7:10 | **inhouse** 14:19 | **involve** 13:19 | 18:12 19:3 20:13 |
| **housed** 65:3 | **initial** 3:13 24:17 | **involved** 13:18 | 20:24 21:3,4,10 |
| **houser** 2:17,20 | 49:23 61:25 64:13 | 14:9,13,15 16:5,12 | 23:13 27:10 28:14 |
| 5:10 | 64:15 67:6 72:11 | 16:14 24:22 42:9 | 30:21,24 31:2,3,22 |
| **houser's** 34:12,14 | **initially** 30:11 | 42:20 54:13 56:2 | 32:15,16,16,19 |
| **howard** 1:15 4:8 | 71:2,3 72:12 | 58:17,19 | 33:11 34:3,14,17 |
| 5:6,22 82:3,10 | **initiate** 18:3 20:25 | **involvement** 16:25 | 35:5,9,14,14,20 |
| 87:3,21 | **instruct** 18:4 | **involving** 13:17 | 36:4,5 39:3,6,6,7 |
| | **instructions** 7:2 | **issue** 15:13 | 39:23 41:6 42:18 |
| **i** | **insurance** 11:15 | **issues** 13:17 15:16 | 42:25 43:2,6,6,7 |
| | 20:4 47:25 48:5,9 | **it.s** 18:7 | 43:23 44:15,16 |
| **idea** 16:21 49:9,10 | **intended** 4:21 | **items** 48:3 | 46:22,24,24 47:3 |
| **ideally** 59:8 | **intentions** 16:21 | | 47:23 49:4 50:21 |
| **ideas** 19:16 | **interact** 14:21 | **j** | 50:24 51:18 53:8 |
| **identification** | 15:5,6,9 42:21,24 | | 53:8,9,11,11 56:13 |
| 36:10,23 37:18 | **interaction** 18:13 | **jacobs** 2:4 6:6 | 58:7,11,11,15,15 |
| 45:14,16 57:2 | 18:16 | **jacobspc.com** 2:7 | 59:2,6,6 60:22 |
| 61:24 62:8 | **interactions** 19:19 | **january** 62:2 72:8 | 61:6 62:14 65:9 |
| **identify** 5:5 62:25 | **interest** 2:10 5:12 | 72:9 | 65:23 66:2 68:22 |
| **image** 25:17 | 49:6 | **jessica** 85:2,14 | 68:22 69:3,9 |
| **imaged** 51:22 | **interested** 16:23 | **job** 8:14,16 11:22 | 70:15,16,17 71:7 |
| **images** 25:16 | 83:14 84:14 85:11 | 12:20 | 71:18,20,20,22 |
| **immediately** 47:20 | 86:11 | **job's** 8:12 | 72:21,23 73:12,17 |
| **important** 6:14 | **interim** 10:21 | **jobs** 11:17 | 74:8 75:2 76:4,19 |
| **inaccurate** 28:22 | **internal** 9:17 | **jolene** 69:11 80:17 | 76:21,22 77:4,9,15 |
| **inbound** 25:19 | **interpret** 66:10 | **judgment** 13:12 | 77:21,24 78:6,9,16 |
| **inception** 65:21 | 69:17 | **july** 1:16 4:11 | 79:10,16 |
| **include** 16:3 21:5 | **interpretation** | 57:23 62:21 72:6 | **knowledge** 32:9 |
| **includes** 37:25 | 66:13,14,17 67:17 | **jump** 64:3 | 38:23,24 40:23 |
| **incredibly** 29:15 | **interpretations** | **june** 22:6 24:18,21 | 42:15,16 43:16 |
| **indicate** 31:11 | 19:16 | 39:12 45:21 57:24 | 77:13,24 80:21 |
| **indicates** 67:25 | **interrogatories** | 57:25 62:20 72:6 | 83:9 84:9 85:6 |
| **indicating** 68:13 | 22:7 57:25 | | 86:6 |
| 70:19 | **interrogatory** 9:3 | **k** | **knows** 35:7,8 |
| **indication** 44:19 | **intervening** 63:21 | | **kuhsmakov** 59:23 |
| **industrial** 11:9 | **introduced** 76:9 | **kari** 1:21 84:2,19 | **kushmakov** 2:3 |
| **information** 18:5 | **invest** 35:25 | **keep** 6:15 38:7 | 3:3 5:8,8 6:4,6 |
| 19:3,24 20:2,15,17 | **investor** 30:9,22 | 40:17 | 8:18 12:2,4,7,10 |
| 20:18,19,21 21:5 | 31:8 42:19,22 | **kept** 52:11 | 22:19 23:3,6,14,18 |
| 21:21 22:23 47:2 | 43:3 53:2 | **kew** 2:5,6 | 23:25 24:9 25:5 |
| 47:3,23 77:19,22 | | **kind** 51:23 74:23 | |
| 77:25 79:3,10,14 | | **knew** 75:25 | |

[kushmakov - mediations]                                                    Page 9

25:24 26:8,18
27:3,5 33:2,8
34:21,25 36:8,13
36:17,24 37:3,6,13
42:2,4 43:14,22
45:11,13,17 53:20
54:6 55:11,16
56:9 57:20 59:19
60:3,9,19 61:8,11
61:14,18,20 65:16
66:6,21 67:15,19
68:3 69:21 70:3
71:19 72:15 73:6
73:16 74:2,12,24
75:5,7,14,17,22
76:2,14 78:5,15
79:2,18,23 80:4,9
80:11 81:21

**l**

**labeled**  36:9
**largely**  8:21 21:12
22:14 25:14 41:14
50:12 51:11
**lasalle**  1:7 2:12
5:14 29:9 31:5
33:15 34:2 55:20
56:4 60:21 63:7
63:19 64:13 65:19
65:20,22 67:7
74:14,19 75:9,25
76:11
**lasalle's**  35:19
**late**  14:8
**law**  8:25 25:12
**law.com**  2:20
**laws**  4:23
**learned**  51:20
**left**  50:8 59:24
**legal**  69:6 70:12
87:1

**lender**  63:19
**leon**  1:10
**let.s**  11:13
**letter**  47:17
**lettered**  36:21
**letters**  25:18 47:22
**level**  50:11
**license**  12:6,6
**licensed**  12:16
**licenses**  11:23
12:11
**lieu**  16:3
**line**  12:12 87:5
**lisa**  24:11 26:3
27:8 33:10,21
37:22 38:15
**listed**  71:24 73:8
**litigated**  9:2 13:16
13:25
**litigating**  50:23
**litigation**  22:22
**little**  8:12 10:20
13:18,21 19:4
45:25 66:20
**live**  51:15
**llc**  1:4 2:2 4:9 5:9
6:7 87:2
**llp**  2:17 5:10
**loan**  2:14 5:16 8:8
8:10,16,16,19,20
8:23,24,24 10:3
12:19,23,25 13:2,4
13:14,15,21,23,24
14:6,9,15 15:21
16:12 17:11 20:20
20:23,24 21:18
24:15,16,22 28:6,7
28:21 31:10,13,24
38:9,13,15 39:9,11
40:20 41:10,17
42:21,23 43:2

44:2,7 46:9,14,16
47:6,12,22 51:6,17
52:18,19,22 54:8
54:24 55:8,18,20
63:17 69:22 73:20
73:24 74:6 80:24
**loan's**  50:11
**loans**  17:21 21:12
21:13,14 29:23,23
30:9 38:14,16,17
40:17 47:19 63:24
71:8,10
**located**  44:14
**location**  1:18
**log**  22:8,21 35:16
52:13
**logic**  66:20
**logs**  25:16
**long**  6:20 8:2
10:14,16 23:18,22
29:15
**look**  35:10 38:3
44:20 45:22 56:18
57:4 62:5 68:24
70:15 71:13 72:7
74:7
**looked**  22:8,11
44:17 72:8 74:4
76:5 79:14,16
**looking**  18:8 19:8
19:10,11,15 24:25
49:12 56:16 57:7
59:7,8 71:11 77:6
77:7,8
**looks**  35:17
**loss**  15:2,10,18
16:3,5,6,12,14,25
17:18 18:14,25
46:14 48:13,17,21
48:25 49:5 50:12
50:24 51:7,12,23

52:2,7,9,12
**lot**  11:2 13:5,5
15:3 19:2 51:16

**m**

**maintain**  54:9
62:16
**maintained**  62:13
62:14
**maintaining**  69:4
69:8
**making**  13:25 69:8
**manager**  10:23
43:11 58:22
**manages**  58:25
**manner**  4:24
28:20,20 40:18
**manufacturer**
11:8
**mark**  36:10,18
61:10,11
**marked**  36:12,18
36:22 37:18 45:14
45:15 56:25 61:4
61:6,9,23 62:7
76:4
**matter**  4:9 18:7
36:14
**matters**  9:2
**mean**  9:16 11:24
12:5 19:6,12
21:14,18 28:17
41:16,17,18 44:10
47:9 48:25 50:15
50:18 52:20 55:20
71:3
**meaning**  64:15
67:11
**means**  4:25 64:16
**meant**  54:19
**mediations**  9:6

**medication**  7:4,6
**meet**  23:7
**meeting**  23:10
**memorializations**
  52:14
**memorialize**  68:15
  68:17
**memorializing**
  52:12
**memorized**  29:6
  34:4 35:18
**mentioned**  9:10
  11:10 33:21 55:17
  58:21 62:10 76:17
  80:13
**merged**  9:25 29:9
**merger**  2:12 5:14
**mers**  9:8,9 12:13
  63:24,25
**mind**  52:16 64:8
**mine**  36:18
**minimizing**  40:17
**minute**  72:8
**minutes**  24:2
  53:21 59:20
**mit**  50:12
**mitigation**  15:3,10
  15:18 16:3,5,6,12
  16:14 17:18 18:14
  18:25 46:14 48:14
  48:17,21 49:2,5
  50:24 51:8,12,24
  52:2,7,9,12
**mitigation's**  16:25
**mm**  49:18
**mod**  50:5
**modification**
  15:25 18:22,23
  21:3 49:22 50:4
  51:16

**modifications**
  18:25
**moment**  10:5
  32:23 38:2 46:3,5
  57:3 59:12 62:5
**month**  24:20
**monthly**  31:9,11
  35:25 40:25 41:7
  43:24 52:24
**morgan**  2:13 5:15
  64:19
**morning**  4:2 5:17
  6:5
**mortgage**  1:8,9
  2:13,14 4:10 5:15
  5:16 10:13 11:15
  11:20 12:14,16
  18:10 21:15 22:12
  24:11 26:2 27:7
  29:20,24 30:19
  32:21 33:10,21
  35:25 37:21 38:23
  38:25 39:7,8,10,22
  49:7,14 54:13,18
  55:23 56:10 60:12
  60:15 62:23 63:17
  63:17 64:12,12
  67:5,6,24,24 71:22
  72:24 73:17,18,19
  87:2
**mortgages**  22:10
  22:11,13 55:2
**muddled**  74:23

**n**

**n**  2:1 3:1 69:14
**name**  4:2 5:6 6:5
  18:4,5 28:6,14,24
  29:16 43:8 54:25
  58:22 63:20 69:11
  69:13 87:2,3

**narrow**  12:8
**national**  1:7 2:9,11
  2:12 5:11,13,14
  29:7 63:7,19
  64:13 65:20 67:7
**nature**  15:12
**necessarily**  69:17
**necessary**  9:5
  63:21 64:25 81:19
**necessitate**  80:15
**need**  6:19 15:16
  18:9,11 19:4
  29:25 47:25 48:8
  53:21
**needs**  14:17
**neither**  83:10
  84:10 85:6 86:6
**never**  78:20
**new**  1:2,19 2:19
  4:6 13:8 83:21
  84:20
**nights**  10:8
**nod**  6:16
**noises**  6:17
**normal**  35:5
**normally**  35:2
**notary**  1:20,21 4:5
  82:15 83:1,20
  84:1,19 87:25
**note**  21:6 22:12
  26:23 27:2 29:3
  33:13,16,17,25
  34:5 35:2,4,7,12
  44:8,14 46:9 52:4
  53:17 54:7 60:16
  63:17 70:18 72:25
  74:15,20 75:9
  76:10,12 80:25
  81:2
**noted**  82:5

**notes**  21:9,10 22:8
  22:20 35:10 51:12
  59:20
**notice**  43:18 58:6
**noticed**  51:10
**notices**  21:19
  47:20 48:8,11
  81:7
**notified**  30:11,18
  31:4
**notify**  47:14
**nullity**  28:11,16
  28:18
**number**  13:17
  15:8,10 35:6
  36:11
**numbered**  36:20
**ny**  1:19 2:6,19

**o**

**o**  69:14
**oaths**  4:6
**object**  81:11
**objection**  4:16
  5:19 8:15 11:19
  11:24 14:3,11,14
  14:24 17:8 18:15
  20:12 21:7 23:11
  23:16,20 27:9,21
  28:4 34:19 35:21
  36:3 38:11,21
  40:7,12,22 41:22
  42:7 44:4 47:8
  48:23 52:4 54:11
  54:20 55:22 56:7
  58:9,24 59:5,15
  60:18 65:13 66:3
  66:16 67:13 69:20
  69:24 71:16 72:13
  73:3,15,22 74:9,21
  75:11 78:2,12,22
  79:12,21

[obtained - please]                                           Page 11

**obtained** 76:10
79:3
**obviously** 22:6
59:11
**occasionally** 69:25
70:2
**occurred** 21:11
**occurring** 48:25
**october** 76:10
**ocwen** 7:25 8:2,4,6
9:25 10:2 11:12
13:9 14:10 19:13
20:24 21:6,9,10
32:21 34:9 35:9
35:14 39:11,13,18
39:25 40:19,25
41:16 42:14,17
43:24 44:6,13
46:9,13 47:5,11,12
47:14,16 52:17
54:7,8,14 58:15,17
58:19 59:10 62:13
62:15
**ocwen's** 9:21,23
46:14
**offered** 21:3
**offers** 51:12
**office** 15:12 34:13
34:15 35:3
**officer** 4:3 9:8
83:2 84:2
**oh** 10:19 30:15
37:3,6,7 46:2
55:25 58:18 66:17
69:19 70:15 75:24
**okay** 10:22 24:4
28:3 30:15,17
33:23 38:6,9 42:2
46:2,6 57:21 58:2
59:2 61:13,18
62:10 63:15 64:2

74:8,13 75:16,18
76:17 77:9 79:24
81:10,21,22
**okon** 58:12
**ombudsman's**
15:12
**once** 20:24 49:4,15
50:11 80:7
**one's** 47:3
**ones** 13:16 15:9
76:8
**online** 12:21
**opening** 72:4
**opportunity** 81:18
**order** 9:6 63:19
**original** 46:9
63:17
**originated** 29:3
73:24
**origination** 11:2
**originations** 55:4
**outbound** 25:19
**outcome** 21:3
83:14 84:14 85:11
86:11
**outside** 4:14 11:8
52:24
**outsourcing** 19:4
19:6,12
**overruled** 66:15
**owned** 33:13,17
44:7
**owner** 28:7,14,22
28:25 29:2 31:23
32:2 53:17
**owns** 29:22

**p**

**p** 2:1,1
**p.m.** 33:3,6 37:11
37:11 45:8,9
53:24 54:3,4

55:13,14 60:5
81:23
**package** 18:2,6,11
49:15 51:3
**page** 3:2,7 37:20
37:23,24 38:4,4,5
45:20 60:25 61:24
62:4 63:8,16,24
64:4,6 65:24 87:5
**pages** 45:22,24
57:2,4,7
**paid** 47:25,25 48:2
**paints** 51:23
**palm** 7:18
**pandemic** 4:12
**parallel** 48:22,24
**parse** 41:15
**part** 17:17 57:9,24
61:25 66:8
**participant** 4:13
**parties** 4:13,17
70:22 83:11,13
84:11,13 85:7,10
86:7,10
**party** 16:10,20
19:7,15 55:10
**pass** 2:14 5:16
**pause** 46:4
**pay** 8:12 48:7
**payment** 9:13
15:14 20:18 22:9
25:16 49:23 74:4
**payments** 21:15
21:16 74:6
**payoff** 18:10
**payoffs** 16:2
**pc** 2:4 6:6
**pendency** 16:14
58:6
**pending** 6:21
50:23

**performed** 26:9
**period** 49:21 50:4
**permission** 29:25
**permitted** 4:21
**person** 64:10 67:4
67:22 69:10
**personally** 42:23
**pertain** 12:12 26:2
**pertaining** 11:25
26:10 52:18,22
**pertinent** 22:22
80:22
**ph** 11:15
**phh** 9:22,24,24,25
10:2 11:12 34:12
39:12
**phone** 17:5 46:20
46:22 52:21 79:3
**physical** 75:9
80:24,25
**physically** 34:3
35:7 44:14
**pick** 50:7
**picked** 24:24
**picture** 31:6 51:23
**place** 28:8,9 39:14
48:10
**plaintiff** 1:5 2:2
5:9 6:7
**plaintiff's** 3:10
36:20 37:18 43:17
45:14,18,19 46:10
56:25 61:23 62:7
**plan** 15:22,22
18:21
**pleadings** 9:3 22:9
22:13 25:11
**please** 5:5,19 6:19
6:23 7:15,17
37:19 38:3 44:23
57:19 62:4 69:13

81:14
**point** 49:15,19
50:2,20 80:15
**policy** 48:12
**ponce** 1:10
**pool** 66:5
**pooling** 28:23
54:23 55:19 56:11
56:19 60:23 62:10
66:7,10,13 68:12
69:23 70:21,24
72:2 73:8,10
**pose** 67:10
**posed** 15:16 63:4
**position** 10:22
12:19,23 14:20
81:4
**positive** 40:18
49:20
**possess** 9:20
**possession** 29:2
46:8,8 75:9 76:7
76:12 77:3 78:7
78:10 80:25 81:2
**possible** 53:6
72:24 73:5
**possibly** 59:16
**post** 10:25 11:4
**postdated** 28:10
**pour** 61:3
**power** 40:2
**pre** 10:25 11:4
**predated** 28:10
**preparation** 22:17
23:8 25:21 26:14
**prepare** 18:2 20:7
20:11 40:25 41:11
42:17
**prepared** 42:15
85:3 86:3

**prepares** 41:13
**presence** 4:15
**present** 6:12
**presented** 18:2
**presently** 7:4,22
**pretty** 11:21 13:7
34:12 35:13
**primarily** 13:14
**prints** 76:5
**prior** 10:10,12
11:6,7,14 12:22
16:25 20:23 21:24
25:17 28:8 38:16
47:15 83:4 84:4
**private** 11:15
**privilege** 23:20,23
**privileged** 23:12
23:21 26:24
**proactive** 50:22
**probably** 15:10
19:14 31:3 58:12
77:7
**problem** 61:4
**procedural** 4:22
**procedure** 47:6,9
**proceed** 6:2 57:19
75:20
**proceeding** 1:18
4:4,20 81:23 85:4
86:4
**proceedings** 83:3
83:4,5,8 84:3,4,5,8
85:5 86:5
**process** 15:25
17:21 18:7,25
49:17
**processing** 15:15
**produced** 4:19
22:5
**product** 26:25

**production** 3:11
45:19 57:10
**products** 11:9
**promoted** 14:6
**proper** 16:11 28:8
63:18
**property** 16:22
51:14
**prove** 13:12
**provide** 9:15 41:7
41:10
**provided** 40:2
**provides** 41:13
64:25
**providing** 70:8,9
77:18,21
**proving** 70:6
**public** 1:20,21
4:13 82:15 83:1
83:20 84:1,19
87:25
**pull** 32:23 36:8,25
61:4
**pulls** 35:16
**purchase** 21:9
**purchased** 21:6,10
**pursuant** 81:16
**pursue** 40:20
**put** 22:19 28:9
43:14 44:24 49:16
50:21 78:19
**putting** 78:25

---

**q**

**qualified** 83:7
84:7
**quality** 10:23,24
**question** 6:21,22
6:25 12:8 23:22
30:16 41:23 44:5
46:7 55:6 57:12
63:4,9 67:10

68:25 75:3,21,23
78:8
**questioned** 54:22
55:2
**questions** 6:10
9:12,13,14 15:16
18:18,19,21,22
19:3 27:11,12,13
27:14,15 54:18
79:25 80:22

---

**r**

**r** 2:1 43:9 69:14
**raise** 5:20
**rate** 27:6,10
**reach** 16:18 17:3
19:9 20:3 21:2
47:19 48:4
**reached** 58:8
**reaching** 77:2
**read** 24:16 25:11
29:5 51:19 57:12
65:10 66:22 67:3
82:3
**reading** 25:10
51:11 66:19 67:21
**ready** 60:8
**real** 44:18
**really** 19:20 36:14
51:13
**reason** 6:21 16:20
32:3,4 48:15,16
49:10 87:5
**recall** 14:7 34:24
39:17 51:9,19
74:11
**receive** 12:18,21
12:22 31:8 48:9
**received** 19:22
37:4 49:16 78:14
**receives** 41:21
47:11

**receiving** 35:24
  47:7
**recommend** 17:11
**recommendation**
  17:14
**record** 4:4,7,17
  5:5 13:12 22:20
  23:25 24:5,6,8
  25:25 26:23 29:16
  32:25 33:4,5,7
  36:15 37:8,9,11,12
  37:17 43:15 45:5
  45:7,9,10 51:20
  53:25 54:2,4,5
  55:11,12,14,15
  57:17 60:6,7 64:9
  66:24 75:19 77:4
  78:9 80:18 81:8
  81:21 82:6 83:9
  84:9 85:5 86:5
**recorded** 4:24
  83:6 84:6
**recording** 4:19
  63:24 83:8 84:8
  85:3 86:3
**records** 9:19,21,22
  22:5,14 25:11,13
  25:15,18 27:23
  52:11 56:17,18
  59:7,18 69:16
  76:25 78:13,17
  79:15,15
**recourse** 63:18
**redacted** 22:23
**reduced** 83:6 84:6
**refer** 22:16 29:15
  38:13,17 46:25
**reference** 24:21
**referencing** 12:24
  33:10

**referred** 63:13
**referring** 8:16
  33:20 34:20 42:14
  47:4 53:15 55:24
  70:16 73:11 76:15
**refers** 38:15
**regarding** 9:13
  15:21 20:19 63:9
**regards** 16:22
**regular** 21:11
**regularly** 14:22
**reiterated** 78:18
**rejected** 50:3
**related** 9:14 47:22
  68:18 83:10 84:10
  85:7 86:7
**relation** 51:5 52:7
**relationship** 29:21
  64:22,23
**relative** 83:12
  84:12 85:9 86:9
**release** 68:18
**relevant** 43:16
**remained** 29:11
**remember** 10:19
  71:12
**remind** 25:2
**remote** 1:18 4:11
**remotely** 4:14 5:5
**repayment** 15:22
  18:21
**repeat** 31:18 41:25
  70:7
**rephrase** 6:23
  12:15 73:19 78:8
**replace** 32:21
**replayed** 57:17
**reply** 78:24
**report** 20:7,11,14
**reported** 1:20

**reporter** 4:2 5:18
  6:2,12,13,17 24:4
  24:7 32:24 33:3,6
  36:11,24 37:2,5,10
  45:6,8 53:22,24
  54:3 55:13 57:11
  57:14,17 59:22,25
  60:5,8 75:18
  81:22
**reporting** 21:16
  21:17 30:9,22
  31:9 40:9 42:19
  42:22 43:3 53:2
**reports** 31:9,11
  35:25 40:25 41:4
  41:7,11,13,15 42:6
  42:10,15,17 43:24
  44:3 51:25 52:6,8
  52:21,24
**repository** 25:17
**represent** 37:24
**representatives**
  16:9
**representing** 6:7
**request** 3:10 45:19
  49:7,14 80:17
**requested** 24:23
  57:18
**requests** 15:25
  44:19 81:13,17
**require** 43:15
**required** 9:5 30:22
  41:7
**research** 8:25 9:10
  9:11,15,16,16,19
  14:16 19:24 20:19
  25:8 26:9,10
  27:19
**researched** 15:17
  27:24

**researching** 24:16
**reserve** 80:11,16
  81:5
**resolution** 15:21
**respect** 63:16
**respond** 6:10 26:6
  26:23 43:19
**responds** 49:3
**response** 20:5 22:7
  24:22 27:2 51:25
  52:8 57:25
**responses** 3:9 9:3
  9:15 13:20 16:23
  45:19
**responsibilities**
  13:22 70:23
**responsibility**
  40:13,14
**responsible** 69:3
**responsive** 67:16
**rest** 53:21
**restart** 75:3
**result** 14:16
**resume** 50:7
**retained** 25:17
**retrieving** 59:17
**review** 21:24 22:3
  59:20 66:7,9
  80:14
**reviewed** 22:4,6
  25:21,25 27:22
  68:16
**reviewing** 26:4
**right** 5:20 16:19
  19:14 27:24 28:13
  31:23 32:14 38:5
  40:11 45:12 46:5
  50:25 55:9 59:4
  59:14 61:5 69:18
  80:12,16 81:5

**rma**  49:14
**rml**  1:8
**road**  2:5 7:18
**robert**  43:7,8,10
  43:16,18 58:22
  59:2 80:18
**rogs**  24:23
**rrm**  1:8
**rule**  3:12 61:8,25
**rules**  4:23
**run**  48:21,24
**rusinko**  1:21 84:2
  84:19

**s**

**s**  2:1 3:6 43:9
  69:14 87:5
**safety**  4:13
**sake**  48:20
**sales**  11:8 16:2
**saw**  62:20,20
**saxon**  39:10,18,22
**saying**  6:14
**says**  58:4 64:7
  67:22
**school**  10:6
**scra**  17:23
**screen**  44:25 45:12
  61:21 76:5,5
**screens**  76:6,13
**scroll**  37:23 45:25
**scrolling**  62:24
  72:18
**search**  17:23
**second**  22:11 37:8
  46:4 67:20
**section**  64:7 65:11
  66:23 67:12 71:25
**securitized**  55:8
**see**  6:12 11:13
  16:19 17:24 19:11
  19:17 35:10,17

39:16 45:24 57:23
59:17,18,23 62:5
63:23 64:2,7
68:25 73:4,8
**seeing**  51:9 71:12
**seeking**  15:20 58:5
**seen**  30:25 35:5
  37:14 38:6,7,8
  39:24 41:4,9
  43:23 57:5,6,8,10
  57:21 62:17,19
  70:19 78:20 79:8
  79:19
**send**  13:9 16:11
  17:4 18:6 21:19
  41:14 47:16,20,21
  48:8,11
**sending**  76:11
**senior**  8:10,16,20
  8:24 12:19 13:2
  13:15,21,24 14:5,6
  14:9
**sense**  51:16 59:13
**sent**  19:23 22:21
  34:12,14,17 35:2
  35:11,12,17 42:6
  46:19 50:2 51:2
**sentence**  65:11,12
  66:23 67:9,12,20
**series**  2:15 5:17
  6:9
**service**  21:12,13
  21:14 22:20 24:15
  29:23 31:16 47:15
  72:12 73:9
**serviceman**  17:24
  17:25
**servicer**  10:2 17:9
  20:23 25:18 29:24
  29:25 30:4 31:16
  31:20,25 32:7,22

39:8,13 40:5,19
41:18,19,21 42:6
42:10,21 44:7,13
46:13 47:5,12,15
52:17 55:6 70:25
71:13,15,23,25
73:18,20
**servicer's**  40:9
**servicers**  13:6
  30:21
**services**  71:4,5,7,9
  76:25 77:4 78:9
  80:19 81:8
**servicing**  9:14
  10:3 15:4 21:18
  22:8 28:23 31:9
  31:24 39:11,14,18
  39:24 42:23 43:2
  44:18 47:21 54:7
  54:8,15,23 55:19
  56:11,19 60:24,25
  62:11 66:8,10,14
  68:12 69:23 70:21
  70:24 72:2,16,21
  73:10
**set**  22:7 64:17
**severity**  15:24
**shake**  6:15
**share**  61:21
**sharepoint**  69:14
**sharing**  64:8
**sheet**  82:5 87:1
**shelley**  1:20 4:3
  83:2,20
**short**  16:2
**shortly**  29:3 50:2
  73:23
**show**  9:6
**shown**  80:20
**shows**  81:13

**sic**  4:10 33:3
**side**  40:9
**signature**  83:19
  84:18 85:13 86:13
**signatures**  72:16
**signed**  22:6 72:22
**silas**  1:20 4:3 83:2
  83:20
**similar**  39:21
**simply**  29:24
**sir**  24:10 80:3
**situations**  49:9
**skills**  83:9 84:9
  85:6 86:6
**sold**  29:10
**solutions**  87:1
**somebody**  19:22
  19:23 31:2 36:6,6
  39:7 53:9 58:20
  69:6
**soon**  30:12
**sorry**  10:15 20:8
  30:13 32:12 36:11
  36:24 52:5 63:15
  64:6 65:7 70:7
  74:17,24 76:20
**sort**  9:10 15:21
  20:2,7,11,15 25:8
  52:22 59:8 68:14
  79:15
**sorts**  18:20 27:14
**source**  77:24
**speak**  16:10 31:24
  39:19 59:11,13
  67:19 68:15
**speaking**  14:17
**speaks**  16:6 63:24
  68:21 70:21
**specialize**  13:16
**specific**  38:13
  47:10 51:20 68:20

73:24
**specifically** 10:24
  30:21 32:18 39:5
  42:18 57:2 70:22
  79:16
**specifies** 71:7
**specify** 25:15 71:9
**specifying** 71:13
**spell** 43:8 69:13
**spoken** 56:21
**spreadsheet** 22:16
  22:21 26:12,16,19
**spreadsheets**
  20:13,16
**stamped** 45:22
  46:11 57:2 62:4
**stand** 18:24
**standing** 23:20
  28:6,12 70:6,8,9
**stanley** 2:13 5:15
  64:19
**start** 8:22 18:7
  39:4 49:2 74:22
**started** 8:4,6 16:13
  26:12
**state** 7:15 80:6
  83:21 84:20
**stated** 60:23 61:2
**statement** 80:8
**statements** 82:7
**states** 1:1
**stay** 11:20
**stenographic** 4:25
**step** 47:13
**steps** 50:22
**stipulates** 63:20
**stipulation** 5:2
**stop** 63:15
**stopping** 50:19
**stored** 33:25 34:5

**stratton** 69:12
  70:11 80:18 81:7
**street** 2:18
**subject** 51:6 73:20
  74:15
**submit** 49:13
**submitted** 65:2
**subscribe** 82:6
**subscribed** 82:12
  87:22
**subsequent** 71:5,6
**substance** 23:14
**succeeded** 39:10
**successor** 2:10,12
  5:12,14 10:2
  33:18 35:20 68:10
**successors** 29:8
**suite** 2:5,18 7:18
**sum** 23:14
**summarize** 27:19
  27:25
**summarized** 27:24
**summarizing**
  52:11
**summons** 37:20
  37:25
**supervisor** 42:25
  43:3
**suppose** 31:21
  40:8 53:6
**supposed** 54:25
**sure** 6:11 14:7
  19:9 24:3,4 32:16
  33:2 34:12 35:13
  35:14 36:4,5
  41:23 47:9,11
  53:22,23 57:14
  59:22,25 60:2
  61:13 63:5 64:23
  66:12 68:20,22
  69:8,17 75:16

76:2 80:9
**swear** 4:14 5:19
**sworn** 4:17 5:23
  82:12 83:5 84:5
  87:22
**system** 77:7 78:19

**t**

**t** 3:6 69:14,14,14
**table** 62:25
**take** 4:4,5 6:17,20
  21:15 23:4 43:20
  44:20 45:22 50:22
  53:20 55:7 57:3
  59:19,20 62:5
  64:2 66:19 72:19
  75:14
**taken** 4:9 7:7
  25:12 51:8 81:15
  83:3,11 84:3,11
  85:8 86:8
**takes** 47:13
**talk** 10:4
**talked** 76:7
**talking** 15:2 26:13
  26:13 65:14 79:13
**talks** 76:9
**tasked** 8:25 9:4
  69:7 77:2
**tax** 21:17
**taxes** 47:24 48:7
**tell** 5:24 6:23
  31:16 32:20 44:17
  57:7 58:2 77:6,7,8
  80:23 81:2
**tells** 51:21
**ten** 11:16 59:21
**tend** 13:18,19
**term** 19:14
**terms** 18:22 28:23
  54:23

**testified** 5:25 26:4
  42:5 54:17 62:22
  73:11 74:14
**testify** 7:12
**testifying** 83:5
  84:5
**testimony** 81:12
**text** 76:15
**thank** 5:18 34:23
  42:3 57:16 60:3
  75:6,17 79:25
  80:3 81:20
**thanks** 12:9 60:4
**thereabouts** 31:7
  55:5
**thing** 18:11 52:16
**things** 9:4 11:5,21
  13:17,19,20 20:5
  21:4,17 25:18,20
  47:24 69:11 80:4
  81:3
**think** 10:20 17:22
  19:3,5,8,11 23:22
  24:23 25:11 27:18
  27:22 30:22 31:3
  31:4,6 36:17,19
  39:17,19 40:2,4,16
  46:3,6 52:25 53:5
  53:7 57:9,12,24
  61:5,14 71:11
  72:6 74:4,23 76:3
**thinking** 27:16
  42:19
**third** 16:10 19:7
  19:15 22:11 63:8
**three** 10:15,17
  38:18,20 67:3
**time** 1:17 5:4 6:19
  11:11,12 24:7
  29:24 31:4,5,10
  33:6,13,19,24

37:10 44:6,13
45:8 46:13 47:16
48:14 49:15,19,21
50:2,20 52:17
53:24 54:3 55:13
56:2 57:10,21
60:10,14 64:3,16
65:12 67:4 68:7
70:20 71:5 72:19
72:25 75:10,13
80:2
**timeframe** 50:11
**timeline** 20:17,21
20:22 21:5,22
26:11,15,19 48:25
**times** 19:2 35:6
50:14 67:3
**title** 8:7,9 18:9
43:10 51:14 70:14
**today** 6:10 34:18
34:22 79:25 81:13
**today's** 21:25
22:17 23:8 25:22
**top** 34:16 46:23
47:3 52:25 53:7
58:16 63:16 68:23
74:10
**total** 38:17
**tough** 11:21
**tracking** 50:9
79:15
**training** 12:18,20
12:21,22 13:2
**transactions** 9:13
**transcriber** 85:1
86:1
**transcript** 4:19
25:12 80:14 81:18
82:4,6 85:3,4 86:3
86:4

**transcriptionist**
83:7 84:7
**transfer** 39:18
47:15
**trials** 9:7
**tried** 11:20 28:9
28:20
**true** 83:8 84:8
85:4 86:4
**trust** 2:14 5:16
17:10 28:24,25,25
29:2,4,5,10,11,14
29:19,21,22,22
30:5,18 31:2,15,19
32:6,17,18 33:15
33:16,17 35:19
39:15,25 40:5,14
40:15,16 41:2
44:9,10,11 46:8
52:19 53:4,9,10,12
53:14,15 54:24
55:8,9,18,24 56:4
56:5 60:13 62:14
63:20 64:17 65:2
65:3,4,21 66:5
68:11,19 71:18,21
72:6 75:13 76:10
78:4,25
**trust's** 54:25 61:25
**trustee** 2:10,11,13
5:12,13,15 29:7
31:5 33:18 40:14
53:13,14 56:4
64:12 67:6,24
68:11 77:14,15
78:14 79:14
**trustees** 29:12
71:6
**trusts** 77:2
**truth** 5:24,24,25

**truthfully** 6:11
**try** 9:14 15:20
16:19 47:18 48:4
**trying** 19:24 40:17
48:20 66:19 74:22
**tuesday** 1:16 4:11
**two** 11:17 57:2,4,7
63:7
**type** 11:25 26:23
52:6 55:7 68:18
69:15
**typewriting** 83:6
84:6
**typical** 18:13,16
19:18
**typically** 69:22

## u

**u.s.** 61:25 68:6,8
77:17,18,21
**ultimately** 40:10
**um** 69:25
**unable** 80:23 81:2
**uncommon** 35:6
**uncontested** 13:7
**understand** 4:18
6:22,24 7:2 41:23
48:21
**understanding**
64:21 65:12,18,18
67:11
**underwriters** 11:3
**unemployment**
10:21 11:10,11
**unit** 14:18,21,23
14:25 15:19 18:14
**united** 1:1
**unpack** 64:7
**unsigned** 73:12
**usb** 62:4 63:6,8,9
64:3 65:14,25
66:25 67:12 70:16

**usb407** 45:22
46:11
**usb450** 57:3
**use** 7:16 18:25
**uses** 4:21
**usually** 18:18
19:23 68:16 71:2

## v

**v** 1:6 87:2
**vacate** 58:6
**various** 22:10
**venturini** 86:2,14
**verbal** 6:15
**verification** 19:7
19:15
**verify** 19:4,10
47:24
**verifying** 19:3
**veritext** 4:3 87:1
**versus** 27:7 33:10
33:21
**videoconference**
1:14 2:3,16
**virtually** 4:19
**visually** 41:9
**volumes** 13:23
**vs** 4:9

## w

**waiting** 36:25
**want** 38:3 44:22
**way** 7:13
**we've** 73:11
**week** 56:16
**welcome** 47:17
**went** 37:11 45:9
55:14
**west** 7:18
**window** 46:5
**withdrawn** 14:5
15:6 16:5,13

**[withdrawn - zoom]**                                    Page 17

| | |
|---|---|
| 30:12,14 32:22 | 75:5,5 80:10 |
| 38:10 43:2 44:6 | **year** 11:7,17 |
| 47:11 51:20 54:8 | **yearend** 21:17 |
| 56:5 65:7 73:18 | **years** 10:17 11:16 |
| 74:13 77:12 78:8 | 29:13 69:7 |
| **witness** 4:14,17,18 | **yohay** 2:16 5:10 |
| 5:19,23 23:24 | 5:10 7:16 8:15 |
| 25:3 26:4 34:24 | 11:19,24 12:3,5,8 |
| 65:14 66:4,17 | 14:3,11,14,24 17:8 |
| 67:21 69:25 71:17 | 18:15 20:12 21:7 |
| 72:14 73:4,23 | 22:25 23:4,11,17 |
| 74:10 75:12,20,24 | 23:19 24:3 25:2 |
| 76:3 78:3,13,23 | 26:6,22 27:9,21 |
| 79:13,22 83:4 | 28:4 29:16 34:19 |
| 84:4 | 34:23 35:8,21 |
| **witnesses** 13:10 | 36:3,15,19 37:7 |
| **witnesses'** 87:3 | 38:11,21 40:7,12 |
| **wording** 68:19 | 40:22 41:22,24 |
| **work** 11:6,25 | 42:3,7 43:20 44:4 |
| 12:12 26:25 40:6 | 45:4 47:8 48:23 |
| 49:3 69:22 70:4 | 52:4 53:23 54:11 |
| **worked** 11:7 | 54:20 55:22 56:7 |
| **working** 10:8 | 57:11,15,19 58:9 |
| 24:18,19 40:18 | 58:24 59:5,15 |
| **worthington** 7:18 | 60:2,4,18 61:6,9 |
| **wrap** 75:15 | 61:13,17,19 65:13 |
| **writing** 22:24 23:2 | 66:3,16 67:13,17 |
| 26:5,21 43:18 | 69:20,24 71:16 |
| 76:6 81:14 | 72:13 73:3,15,22 |
| **written** 5:2 17:4 | 74:9,21 75:2,6,11 |
| **wrong** 46:3,5 | 75:16 78:2,12,22 |
| | 79:12,21 80:6,10 |
| **x** | 81:10 |
| **x** 3:1,6 | **york** 1:2,19 2:19 |
| **xyz** 20:3 | 4:6 13:8 83:21 |
| | 84:20 |
| **y** | |
| **yeah** 12:2 34:8,21 | **z** |
| 36:19 37:10 38:6 | **zoom** 4:4,11 |
| 41:20 45:6,6 46:3 | |
| 57:16 61:19 68:20 | |
| 69:6 71:2 74:24 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

# VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.